OPINION OF THE COURT
Martin Marcus, J.
The defendant was indicted by the grand jury of Bronx County and charged with 21 counts of grand larceny in the second degree (Penal Law § 155.40 [1]); eight counts of grand larceny in the third degree (Penal Law § 155.35 [1]); and two counts each of money laundering in the first degree (Penal Law § 470.20 [1] [b] [i] [A]; [ii] [A]) and scheme to defraud in the first degree (Penal Law § 190.65 [1] [a], [b]). The defendant is also charged with two counts of fraudulent practices in respect to stocks, bonds and other securities (General Business Law § 352-c [5], [6] [hereinafter the Martin Act counts]). In essence, the defendant allegedly operated a “Ponzi scheme” in which he fraudulently induced 29 people to place with him some or all of their retirement savings or other funds, totaling millions of dollars. Promising to invest their money either in a real estate project or in various financial instruments, and assuring them that they would receive a (more or less) guaranteed rate of return, he did not invest their funds as promised, and instead used their money to make some payments due to earlier investors and to pay airlines, casinos, restaurants and others for personal expenses. Some of the investors received none of the *566 payments their agreements called for. A few initially received the monthly payments they were due, but soon those payments came in lesser amounts and then stopped altogether.
In an omnibus motion, the defendant seeks, inter alia, inspection of the grand jury minutes and dismissal or reduction of the charges. The defendant’s motion to inspect the grand jury minutes is granted to the extent that the court has inspected and reviewed the minutes.
The Martin Act Counts
The defendant challenges the grand jury evidence and instructions concerning the final two counts of the indictment, which charge the defendant with the Martin Act crimes. The 34th count alleges that the defendant
“intentionally engaged in a scheme constituting a systematic ongoing course of conduct with intent to defraud ten or more persons and to obtain property from ten or more persons by false and fraudulent pretenses, representations and promises, and so obtained property from one or more such persons while engaged in inducing and promoting the issuance, distribution, exchange, sale, negotiation and purchase of securities.”
The 35th count alleges that the defendant
“intentionally engaged in fraud, deception, concealment, suppression, false promise and fictitious and pretended purchase and sale, and made material false representations and statements with intent to deceive and defraud, while engaged in inducing and promoting the issuance, distribution, exchange, sale, negotiation, and purchase within and from this state of any securities, and thereby wrongfully obtained property of a value in excess of two hundred fifty dollars.”
The defendant attacks these counts on several grounds. First, he argues that they should be dismissed because the People failed to establish before the grand jury that the various types of notes and agreements that are the subject of these counts are “securities” within the meaning of the Martin Act. Second, the defendant asserts that the People failed to adequately instruct the grand jury concerning the Martin Act’s definition of “securities,” and to distinguish in their instructions to the grand jury how that definition applies to each of the types of instruments the investors received. Third, he insists that the evidence was *567 insufficient to prove, as these counts require, that the defendant intended to defraud the investors and that he wrongfully obtained property by means of misrepresentation. In addition, the defendant maintains that because the Martin Act counts must be dismissed, the Attorney General lacks jurisdiction to prosecute the remaining counts of the indictment.
Both Martin Act counts require that the defendant engage in fraudulent conduct “while engaged in inducing or promoting the issuance, distribution, exchange, sale, negotiation or purchase of any securities.” (General Business Law § 352-c [5], [6].) Section 352 (1) of the Martin Act defines “securities” as “any stocks, bonds, notes, evidences of interest or indebtedness or other securities.” (General Business Law § 352 [1].) According to the evidence before the grand jury, the defendant provided several different kinds of instruments to investors. Some of the investors made only one investment and received only one type of instrument; some made more than one investment and received two or more types of instruments.
Some investors received an instrument (the Rockwell agreement) characterized on its face as an “agreement” between Rockwell Consulting of NY and IRA Services Trust Company, “FBO” (for the benefit of) the investor, which stated that the investor (identified in the agreement as the client) “understands that this investment will be placed into U.S. Government Securities, High Grade Corporate Bonds and possibly various other entities.”[1] The standard agreement for this form of investment promised that
“[p]rovided . . . the investment, which is subject to market risk and other unforseen circumstances[,] is still viable, full repayment shall be made upon completion and sale, which will be a minimum of [a specified number of] years, of the entity for which the money is earmarked and shall earn interest at a rate of [a specified percentage] per annum . . . .”
What “completion and sale” and “the entity for which the money is earmarked” meant in the context of an investment in *568 securities and bonds, and what “various other entities” the investor’s money might be placed in, were left unexplained both orally by the defendant and in the written agreement.
Some investors gave the defendant money for what the defendant described orally as a real estate project (the real estate investors). Almost always, the defendant described the project as the construction and operation of a combined commercial and residential property on Blondell Avenue in the Bronx, near the defendant’s office. A number of the real estate investors received a document entitled an “Agreement” (the M.I.G. agreement), in which “M.I.G. of Westchester, Inc.,” “FOR VALUE RECEIVED,” agreed to make “FULL REPAYMENT” to the investor “upon completion of the entity for which the money is earmarked” and would earn interest on the investment at a fixed and specified percentage rate. The agreement stipulated that “[t]he funds invested MUST remain on deposit until such time as the venture is completed in order for the interest to be earned.”[2] The agreement specified neither the “entity” nor the “venture” that was the subject of the agreement.
One investor received a document (the Empire Builders agreement), similar to the M.I.G. agreement, which was also entitled “Agreement,” in which “Empire Builders of New York Corp.,” “FOR VALUE RECEIVED,” agreed to pay to IRA Services First Regional Bank, “FBO” the investor, monthly payments “representing interest only at an annual rate of 9% for a period ending upon completion of construction, at which time the entire unpaid principal balance shall become due and payable.” The agreement itself characterized the instrument as a “note.” The agreement stipulated that “[t]he sum owed shall be utilized for the purchase and construction of real estate and the subject property shall be identified to the obligee when the money is placed on said property.” Another investor received both an Empire Builders agreement and an M.I.G. agreement, identical to those described above. Despite the language in each agreement, the defendant told this investor that both of her investments would be placed in mutual funds.
A number of other of the real estate investors received in return for their investments class B share certificates in “RS *569 Enterprises of New York, Inc.” The subscription agreement that accompanied the stock certificate specifically referred to the shares as “securities.” The subscription agreement did not specify that the investment was for purposes of a real estate project, let alone specify what the project was.
The Court of Appeals has observed in numerous cases that the Martin Act, also known as “New York’s Blue Sky Law, should be liberally construed to give effect to its remedial purpose of protecting the public from fraudulent exploitation in the offer and sale of securities.” (All Seasons Resorts v Abrams, 68 NY2d 81, 86-87 [1986] [citations omitted].) As the Practice Commentaries to article 23-A of the General Business Law observe,
“Judicial decisions construing the term ‘security’ as used in the Martin Act maintain that the reach of the statute does not stop with the obvious and commonplace. Novel, uncommon or irregular devices, whatever they are called or however they are made to appear, are also encompassed if it is proved that they were offered to the public or dealt in under the terms which established their character as speculative ‘evidences of interest’ which are, in fact, ‘securities.’ ” (Orestes J. Mihaly & David J. Kaufmann, Practice Commentaries, McKinney’s Cons Laws of NY, Book 19, General Business Law art 23-A at 16 [1996 ed].)
The Court of Appeals has announced that “[i]n our application of the statute, we find it appropriate to consider as persuasive authority the decisions of the United States Supreme Court and other Federal courts construing the Federal Blue Sky Laws.” (All Seasons Resorts, 68 NY2d at 87.)
The defendant argues that at least some of the instruments at issue here are not “stocks, bonds, notes, [or] evidences of interest or indebtedness” and, applying the “Howey test” announced in SEC v W. J. Howey Co. (328 US 293 [1946]), that they do not fall within the catchall of “other securities” included within General Business Law § 352 (l)’s definition of “securities.” The defendant’s claim that particular instruments are not “other securities” is irrelevant if they fall within one of the types of instruments specifically enumerated in the definition. (See All Seasons Resorts, 68 NY2d at 87-88 [because the definition of “security” in General Business Law § 352 “includes a list of specific categories of interests or instruments which constitute securities and, in addition, a general category of ‘securi *570 ties as defined in section (352)’ ... we must determine both whether the ASR membership falls within one of the specific categories and, if not, whether, on examination of its characteristics in the light of decisional law, it meets the broader general definition of ‘securities’ in section 352”].)
Whether or not the Rockwell agreement itself was a “security,” it explicitly promised that the investor’s money would be placed in government securities and high-grade corporate bonds.[3] By that promise, the defendant “inducted] [and] promoted] the . . . purchase of . . . securities,” that is, those government securities and high-grade corporate bonds in which the instrument stated the investor’s funds would be invested.
Other instruments at issue, the M.I.G. agreements received by the investors whom the defendant told their money would be used in a real estate project, were not stocks or bonds, nor were they part of an agreement that induced or promoted the purchase of stocks or bonds. The question is whether, within the meaning of the Martin Act’s definition of “securities,” these agreements constituted one of the remaining enumerated instrument types, that is, either “notes” or “evidences of interest or indebtedness.” The defendant characterizes the M.I.G. agreements as providing “fixed rates of return of the nature of loans of short to medium term financing that allowed the companies to invest in real estate projects, rather than investments that depended more on the success of any particular project ... .” Citing various federal cases, the defendant argues that they are “non-security promissory notes” that fall outside the reach of the Martin Act.
In Reves v Ernst & Young (494 US 56, 64 [1990]), the Supreme Court held that the “Howey test,” applicable in determining whether an instrument falls within the catchall category of “other securities,” has no application in determining whether a note is a security. Instead, the Court applied to notes the “family resemblance” test. That test “begin[s] with a presumption that every note is a security.” (Id. at 65.) The Court held, however, that this presumption is rebuttable, and that a note is not a “security” if it “ ‘bear[s] a strong family resemblance’ to an item on [a] judicially crafted list of exceptions.” (Id. at 64, quoting Exchange Natl. Bank of Chicago v Touche Ross & Co., *571 544 F2d 1126, 1137-1138 [2d Cir 1976].) That list of exceptions includes:
“the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a ‘character’ loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized)” (Reves, 494 US at 65).
Also on the list are “notes evidencing loans by commercial banks for current operations.” (Id., citing Chemical Bank v Arthur Andersen & Co., 726 F2d 930, 939 [2d Cir 1984].) The M.I.G. instruments resemble none of these notes.
The Court also announced in Reves that four factors should be applied in determining whether other kinds of instruments should be excluded as securities even though they do not resemble any of the enumerated exceptions. The first factor is the “motivations that would prompt a reasonable seller and buyer to enter into [the transaction]”:
“If the seller’s purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a ‘security.’ If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller’s cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a ‘security.’ ” (Id. at 66.)
Here, it is plain both from the M.I.G. agreements themselves and from the other evidence before the grand jury that the investors expected the money to be used in “a business enterprise,” that is, the real estate project the defendant described to them. Moreover, despite the statement in the M.I.G. agreements that investors are “aware that they are not receiving any shareholder profits,” the evidence establishes that the interest the investors expected to earn, as well as the return of their original investment, would come from the revenues produced by the project. Here, as in Reves, “the transaction [was] most naturally conceived as an investment in a business *572 enterprise rather than as a purely commercial or consumer transaction.” (Id. at 68.)
The second factor focuses on the “plan of distribution.” (See id. at 66.) This factor considers whether “it is an instrument in which there is common trading for speculation or investment.” (Id. [internal quotation marks and citation omitted].) As far as the grand jury evidence reveals, the M.I.G. agreements were offered to no more than eight investors, and there was no additional evidence of their “common trading.” However, the M.I.G. agreements were plainly designed for investment purposes and bore no prohibition against being traded. As the Supreme Court recognized in Reves, the stock of a closely held corporation has been held a “security” even though it was not traded on an exchange. (Id. at 68 [“(T)he notes were not traded on an exchange. They were, however, offered and sold to a broad segment of the public, and that is all we have held to be necessary to establish the requisite ‘common trading’ in an instrument”].) Transferable “withdrawable capital shares” in a savings and loan association have also been held to be “securities,” even though they were nonnegotiable. (Id., citing Tcherepnin v Knight, 389 US 332 [1967].)
The third factor, directed to “the reasonable expectations of the investing public” (id. at 66), provides that instruments should be considered to be securities “on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not ‘securities’ as used in that transaction.” (Id. at 66.) In this case, as in Reves, the M.I.G. real estate investors could reasonably expect that the instruments they received were “securities.” Indeed, the defendant spoke of the M.I.G. transactions as investments and the M.I.G. agreements explicitly referred to the money being given to the defendant as “for investment purposes.” (See id. at 69 [“The advertisements for the notes here characterized them as ‘investments,’ . . . and there were no countervailing factors that would have led a reasonable person to question this characterization”].)
The final factor is whether “some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary.” (Id. at 67.) Here the defendant points to no such alternative regulatory scheme, and, as in Reves, the M.I.G. agreements appear to be uncollateralized and uninsured and “would escape federal [and state] regulation entirely if the Acts were held not to apply.” (Id. at 69.)
*573 Considering these four factors, it is apparent that the defendant has failed to overcome the presumption that the M.I.G. agreements were “securities,” and I find that they were.
More broadly, the court in Matter of Waldstein (160 Misc 763, 767 [Sup Ct, Albany County 1936]) held long ago that “any form of instrument used for the purpose of financing and promoting enterprises, and which is designed for investment, is a security according to the modern meaning of that term.” More recently, the New York Court of Appeals applied the Waldstein test in All Seasons Resorts (68 NY2d at 92 [“Nor does the membership have the attributes of an investment (see, Matter of Waldstein, 160 Misc 763, 767, supra, defining security as ‘any form of instrument used for the purpose of financing and promoting enterprises, and which is designed for investment’ [emphasis added])”]; see Practice Commentaries, General Business Law art 23-A at 24 [noting that in All Seasons the Court of Appeals adopted the tests set forth in Howey and Matter of Waldstein]). The Third Department has applied Waldstein as well. (See People v First Meridian Planning Corp., 201 AD2d 145, 153 [3d Dept 1994] [“Furthermore, the services and expertise offered by defendants exceed those offered in Matter of Waldstein and thus meet the test enunciated therein” (citation omitted)], affd on other grounds 86 NY2d 608 [1995].) Applying the Waldstein test in this case, the M.I.G. agreements the real estate investors received were clearly “securities.”
The defendant told the investor who entered into a M.I.G. agreement and a similar agreement with Empire Builders, Inc., that he would invest the money she gave him in mutual funds. However, this M.I.G. agreement, like those the real estate investors received, made reference to “[the] completion of the entity for which the money is earmarked,” and the Empire Builders agreement stated that “[t]he sum owed shall he utilized for the purchase and construction of real estate.” Nonetheless, by his oral representation that the investor’s funds would be placed in mutual funds, the defendant clearly “induc[ed] [and] promot[ed] the . . . purchase of . . . securities” within the meaning of the Martin Act. In any case, ignoring the defendant’s promise that the investor’s money would be placed in mutual funds, and applying either the four Reves factors or the Waldstein test to the instruments themselves, both instruments are still properly classified as “securities” for the same reasons that the M.I.G. instruments the real estate investors received are.
The fourth type of instrument at issue is the shares in R.S. Enterprises of New York, Inc., which a number of the real *574 estate investors received. While, according to the evidence before the grand jury, the defendant told all of these investors that the money each of them gave him would be used in the Blondell Avenue real estate project, the certificates and the subscription agreement these investors received said nothing about that project, and did not specify in any way how the funds would be invested. Although the certificates and subscription agreement avoid using the word “stock,” it is evident from their characterization as “Class B Shares of RS Enterprises of New York, Inc.” that they conveyed to the investors that they are stock in a corporation. The People argue that as “stock” these certificates qualify as “securities.” The defendant does not contend otherwise.
“Whether the label of a particular interest and the description given to it by the parties brings it literally within one of the enumerated categories ... is not determinative.” (All Seasons Resorts, 68 NY2d at 88.) In particular, an instrument described as a stock is a “security” if it possesses “some of the significant characteristics typically associated with stock” (Landreth Timber Co. v Landreth, 471 US 681, 686 [1985] [internal quotation marks and citation omitted]), including: “(i) the right to receive dividends contingent upon an apportionment of profits; (ii) negotiability; (iii) the ability to be pledged or hypothecated; (iv) the conferring of voting rights in proportion to the number of shares owned; and (v) the capacity to appreciate in value.” (Id.; see also United Housing Foundation, Inc. v Forman, 421 US 837 [1975].) The subscription agreement for these shares makes no mention of dividends, and does not appear to confer voting rights. However, its statement that “[t]he purchaser is aware that the Company Shareholder’s Agreement contains significant restrictions on the disposition of Shares” implies that under some circumstances the shares are negotiable. The agreement appears to say nothing more about the ability of the shares to be pledged or hypothecated. The statement in the agreement that “[t]he purchaser understands that there is currently no market for the Shares offered hereunder and that none is expected to develop” suggests that the shares have at least the “capacity to appreciate in value,” however unlikely the prospect that their value would have increased. “There may be occasions when the use of a traditional name such as ‘stocks’ or ‘bonds’ will lead a purchaser justifiably to assume that the federal [or state] securities laws apply” (United Housing Foundation, 421 US at 850). Here, although the *575 subscription agreement explicitly said that these laws did not apply to the shares, the agreement specifically referred to them as “securities.”
Whether or not the shares qualified as “stocks” protected by the Martin Act, the grand jury minutes sufficiently establish that they are nonetheless “securities” within the meaning of the act. The defendant made representations to each of these 11 investors (one indirectly, through her husband) that their money would be used in building the Blondell Avenue project. He told almost all of them that they would (or in one case could) receive their original investments back after the project was completed, and he told all the investors that they would receive a return on their investments after the project was completed and was bringing in rental income. Thus, each understood that, although not specified in the subscription agreement, the R.S. Enterprises shares were the vehicle by which he or she was investing in the project and from which he or she would receive a return. As in Matter of Waldstein (160 Misc at 767), the shares were a “form of instrument used for the purpose of financing and promoting [an] enterprise[ ], and [were] designed for investment.”
Finally, even if they are not the kind of “stock” that qualifies them per se as “securities,” the R.S. Enterprises shares also meet the Howey test that places them squarely within the catchall phrase “other securities” in General Business Law § 352 (l)’s definition of “securities.” As the Court of Appeals explained in First Meridian (86 NY2d at 618-619):
“In Howey, the Supreme Court broadly equated securities under the Federal securities laws with investment contracts, holding that ‘an investment contract . . . means a contract, transaction, or scheme whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits solely from the efforts of the promoter or a third party.’ ” (Citation omitted.)
In this case, the grand jury evidence sufficiently establishes that those investors who received the shares in R.S. Enterprises did so by investing their money; that the money was to be invested in a common enterprise, the Blondell Avenue project; and that the investors were led to expect to have no role in carrying out the project and to profit from their investment solely from the efforts of the defendant and others. (Compare with All Seasons, 68 NY2d at 92 [holding that membership certificates in a system of outdoor resort campgrounds, which entitled the *576 certificate owners to the use of the campgrounds but no share on income or gain from their operation, were not securities because “(f)or an interest to be a security under Howey, there must be an expectation of financial gain or profit. There is simply none here”].)
In sum, the grand jury evidence sufficiently established that, as to all 29 of the investors, the defendant “engaged in inducing [and] promoting the issuance, distribution, exchange, sale, negotiation [and] purchase of. . .securities.”
In the defendant’s next challenge to the Martin Act counts, he claims that the People failed to adequately instruct the grand jury concerning the definition of “securities,” and failed to distinguish in their instructions relating to this term among the various types of instruments the 29 investors received. The People respond that they provided to the grand jury the definition of the term set forth in General Business Law § 352 (1), and that was enough.
The Court of Appeals has held that “a Grand Jury need not be instructed with the same degree of precision that is required when a petit jury is instructed on the law,” and that legal instructions are “sufficient if the District Attorney provides the Grand Jury with enough information to enable it intelligently to decide whether a crime has been committed and to determine whether there exists legally sufficient evidence to establish the material elements of the crime.” (People v Calbud, Inc., 49 NY2d 389, 394-395 [1980].) Grand jury instructions are defective only when they are “so misleading or incomplete as to substantially undermine the integrity of the proceedings.” (People v Caracciola, 78 NY2d 1021, 1022 [1991].)
In Calbud, the Court held that a grand jury instruction reciting virtually verbatim the statutory definition of the term “obscene” was legally sufficient, even though the prosecutor did not advise the grand jury, as a petit jury would have to be told, that it had to judge the allegedly obscene material from the viewpoint of the average person applying statewide contemporary community standards. The Court noted that while the omission “would have been fatal if a determination of guilt hinged upon the instruction, it cannot be said that the omission was so significant in the context of the Grand Jury’s deliberations as to prejudice the interests of the defendants and render the indictments legally defective.” (49 NY2d at 395.) The same can be said here. In particular, given my determination of what is more a legal than a factual question—that the instruments *577 the defendant is charged with inducing and promoting the investors to purchase were “securities” within the meaning of the Martin Act—the defendant was not prejudiced by the prosecutors’ failure to expand upon the statutory definition or to explain how that definition would apply to each of the various kinds of instruments the investors received.
The defendant’s claim that the evidence was insufficient to prove, as the Martin Act counts require, that the defendant intended to defraud the investors and that he wrongfully obtained property by means of misrepresentation is without merit. “Because intent is an invisible operation of [the] mind, direct evidence is rarely available (in the absence of an admission) and is unnecessary where there is legally sufficient circumstantial evidence of intent.” (People v Rodriguez, 17 NY3d 486, 489 [2011] [internal quotation marks and citations omitted].) In this case, the requisite intent to defraud could easily be inferred from the evidence before the grand jury of the defendant’s conduct and of the use to which the investors’ money was put. The evidence that he obtained money from the investors by making misrepresentations was substantial.
Because the Martin Act counts are legally sufficient and the motion to dismiss the counts charging the defendant with them is denied, it is unnecessary to consider the defendant’s claim that, if they had been dismissed, the Attorney General would have had no jurisdiction over this matter.

. There were variations. Some of the instruments these investors received referred to “Government Securities,” rather than “U.S. Government Securities.” One investor received an instrument that specified that the investment would be placed in “Bella Petrella’s Holdings, Inc.” The instrument another investor received was characterized as an agreement between Rockwell Consulting of NY and the investor, and made no mention of IRA Services Trust Company.

. Again there were variations. For example, at least one of these instruments stated that “full repayment shall be made upon completion and sale, which will be a minimum of 4 years, of the entity for which the money is earmarked. . . . The funds invested must remain on deposit until the venture is completed and sold." (Emphasis added.)

. The one exception, the investor who was promised that his funds would be placed in “Bella Petrella’s Holdings, Inc.,” was thereby induced to believe that his investment would be used to purchase corporate securities.