■ The People of the State of New York by Andrew W. Cuomo, Attorney General of the State of New York, Appellant, v Charles Schwab & Co., Inc., Respondent. [971 NYS2d 267]—

Appeal from order, Supreme Court, New York County (O. Peter Sherwood, J.), entered October 31, 2011, which granted defendant's motion to dismiss the complaint pursuant to CPLR 3211 (a) (7), deemed appeal from judgment, same court and Justice, entered April 4, 2012, dismissing the complaint, and, so considered, said judgment unanimously modified, on the law, to deny the motion as to the second and third causes of action insofar as they are based upon conduct that took place prior to September 5, 2007, and otherwise affirmed, without costs.

This is an enforcement action brought by the Attorney Gen-

eral under the Martin Act (General Business Law art 23-A) and General Business Law § 349 as well as Executive Law § 63 (12). The Martin Act causes of action are based on General Business Law § 352-c (1) (a), which, where applicable, prohibits fraud, concealment, suppression or false pretense, and General Business Law § 352-c (1) (c), which prohibits false representations or statements to induce or promote the issuance, purchase or sale of securities within or from the State. It is alleged in the complaint that defendant, Charles Schwab & Co., Inc. (Schwab), a registered securities broker-dealer, engaged in fraudulent and deceptive conduct in the sale of auction rate securities (ARS) to the investing public. The Attorney General asserts that Schwab misrepresented ARS to its customers as safe, liquid investments while concealing the fact that they were complex financial instruments with significant, inherent and increasing liquidity risks.

An explanation of the Attorney General's claims requires a description of the ARS market, which is set forth in the complaint as follows:

"17. Auction rate securities are long-term bonds issued by municipalities, corporations and student loan companies, or perpetual equity instruments issued by closed end mutual funds, which pay variable interest rates that reset periodically through a bidding process known as a Dutch auction. The auctions also serve as the mechanism by which auction rate securities are bought and sold.

"18. At a Dutch auction, bidders generally state the number of auction rate securities they wish to purchase and the minimum interest rate they are willing to accept. Bids are ranked, from lowest to highest, according to the minimum interest rate specified by each bidder. The lowest interest rate required to sell all of the auction rate securities available at auction, known as the 'clearing rate,' becomes the rate payable to all holders of that particular security until the next auction. Depending on the structure of the auction rate security specified in the offering documents, auctions are typically held every 7, 28 or 35 days.

"19. When there are an insufficient number [sic] of buyers participating in an auction to purchase all of the securities being offered for sale, the auction 'fails' and typically no orders to buy or sell are fulfilled. As auction rate securities can only be bought or sold when auctions clear, the most immediate and obvious consequence of an auction failure is that current holders of that issue of auction rate securities are unable to sell their holdings, and suffer a loss of liquidity. If auctions fail

repeatedly, investors are left with no option but to hold the securities to maturity—potentially as long as 30 years, or in the case of auction rate preferred securities, perpetually—with no ability to access their money.

"20. During the period when auctions are not clearing, investors are paid a default rate of interest, called a 'fail rate,' which is specified in the origination documents.

"21. Until February 2008, underwriter broker-dealers generally supported the auction rate securities market by systematically purchasing auction rate securities into their own inventories in order to make up for shortfalls in natural demand that would have, in the absence of such support, caused the auctions for those securities to fail. These proprietary bids placed by the underwriter broker-dealers for their own accounts were known as 'support bids.'

"22. The underwriter broker-dealers were under no legal obligation to place such support bids, and could refrain from doing so at any time in their sole discretion."[1]

The complaint alleges that Schwab became aware of failures in the ARS market and associated liquidity risks as early as August 2007. In February 2008, broker-dealers had stopped making support bids, causing a wholesale failure in the market for ARS. At that time, Schwab directed that its sales force advise its customers that ARS did not carry a 100% certainty of liquidity. Accordingly, investors who had purchased ARS from Schwab found themselves holding investments that were not as liquid as they had been purportedly led to believe.[2] The complaint alleges that "Schwab persistently failed to disclose, or made representations that concealed, the risk that customers could lose liquidity should auctions fail."

In dismissing the Martin Act causes of action, the court concluded that the "misrepresentations alleged were true when made and the complaint contains no allegations that ARS were liquid at a time when they were illiquid." The court based this conclusion on its own finding that there had been no failures in the auctions in the 20 years preceding August 2007. In reaching this conclusion, the court erroneously engaged in an evaluation of the merits of the Martin Act causes of action. On a motion to

1. The complaint's description of the ARS market is consistent with one given by the Second Circuit in *Wilson v Merrill Lynch & Co., Inc.* (671 F3d 120, 123-124 [2d Cir 2011]).

2. In referring to this history, the court suggested that it was treating the motion as one for summary judgment pursuant to CPLR 3211 (c). Such treatment would not have been permissible as the record does not reflect that the parties were given notice as required by the statute.

dismiss for failure to state a cause of action, it is not the function of the court to evaluate the merits of the case (*Khan v Newsweek, Inc.*, 160 AD2d 425, 426 [1st Dept 1990]). The court also found that the complaint did not allege facts from which it could be inferred that Schwab made any actionable representations after September 5, 2007, the date of the first failure of a class of ARS sold by Schwab. We conclude that the second and third causes of action, which are based on the Martin Act, should not have been dismissed.

The crux of the Martin Act causes of action is that Schwab's brokers, employees and managers misled its customers by variously representing ARS as "safe, low risk, highly liquid investments, or cash management alternatives, or similar to money market funds" without disclosing that the liquidity of these instruments was dependent on the successful operation of the Dutch auctions. We find the Martin Act causes of action to be sufficiently pleaded given the fact that the statute is remedial and should be broadly construed in order to attain its beneficent purpose (*see People v Lexington Sixty-First Assoc.*, 38 NY2d 588, 595 [1976]). Under the statute, the word "fraud" is broadly defined so as to embrace even acts which "*tend* to deceive or mislead the purchasing public" (*id.* [citation omitted and emphasis added]). Based on this standard, the complaint sets forth actionable Martin Act claims notwithstanding the absence of a specific allegation that Schwab represented ARS to be liquid at times when they were illiquid. We note that analogous representations regarding ARS have been found to be sufficiently material to be actionable within the context of an enforcement proceeding by the Securities and Exchange Commission (*see Securities & Exch. Commn. v Morgan Keegan & Co., Inc.*, 678 F3d 1233 [11th Cir 2012]). Notwithstanding the Martin Act's liberal pleading standard, the complaint does not allege any facts from which it can be reasonably inferred that Schwab engaged in actionable conduct after September 5, 2007, when the first failure of Schwab-issued ARS occurred.

The court correctly rejected Schwab's argument that the Martin Act does not embrace fraudulent transactions involving customers who were not residents of the State. As noted above, General Business Law § 352-c (1) (c) proscribes fraudulent representations to induce or promote the issuance, purchase or sale of securities within or from the State. The necessary nexus with New York is established by allegations that many of the transactions that gave rise to the actionable conduct set forth in the complaint occurred here (*see e.g. In re Wachovia Equity Sec. Litig.*, 753 F Supp 2d 326, 381 n 50 [SD NY 2011]; *In re Beacon*

*Assoc. Litig.*, 745 F Supp 2d 386, 433 [SD NY 2010]). Specifically, the complaint alleges that the ARS sold by Schwab to its customers were underwritten and/or managed by New York based financial institutions, that Schwab transmitted its customers' buy, sell and hold orders to the trading desks of financial institutions located in New York and that the substantial majority of the auctions of the ARS were held in New York.

The first cause of action was properly dismissed inasmuch as Executive Law § 63 (12), upon which it is based, does not create independent claims, but merely authorizes the Attorney General to seek injunctive and other relief on notice prescribed by the statute in cases involving persistent fraud or illegality (*see State of New York v Cortelle Corp.*, 38 NY2d 83, 86 [1975]). Also, the fourth cause of action is not maintainable inasmuch as General Business Law § 349 does not apply to securities transactions (*Fesseha v TD Waterhouse Inv. Servs.*, 305 AD2d 268 [1st Dept 2003]).

We have considered the parties' remaining contentions and find them unavailing. Concur—Andrias, J.P., Friedman, De-Grasse and Freedman, JJ. **[Prior Case History: 33 Misc 3d 1221(A), 2011 NY Slip Op 52042(U).]**

