[1 NYS3d 910]

THE PEOPLE OF THE STATE OF NEW YORK by ERIC T. SCHNEIDER-
MAN, Attorney General of the State of New York, Plaintiff,
v BARCLAYS CAPITAL INC. et al., Defendants.

Supreme Court, New York County, February 13, 2015

### APPEARANCES OF COUNSEL

*Sullivan & Cromwell LLP* and *Boies, Schiller & Flexner LLP* for defendants.

*Eric T. Schneiderman, Attorney General*, for plaintiff.

### OPINION OF THE COURT

SHIRLEY WERNER KORNREICH, J.

Defendants Barclays Capital Inc. and Barclays PLC (collectively, Barclays) move, pursuant to CPLR 3211, to dismiss the original complaint filed by plaintiff, the Attorney General of the State of New York (the NYAG). Defendants' motion is granted in part and denied in part for the reasons that follow.

## I. Background

This is an action by the NYAG to hold Barclays liable for allegedly false and misleading statements made about its dark pool, known as "Barclays LX" (the Dark Pool). A dark pool, an "Alternative Trading System" (ATS), is a private securities trading platform used to execute securities trades anonymously, unlike public exchanges, such as the New York Stock Exchange.

A reality of modern finance is that a substantial percentage of trading activity is conducted by computer algorithms programmed to rapidly trade large amounts of equities at speeds faster than any person could replicate manually. This is known as "high frequency trading" (HFT). Since trading on public venues is "lit," meaning that order data is immediately made public, opportunities exist for savvy algorithms to beat manual orders (or less savvy algorithms) on lit exchanges. This occurs, for instance, when an institutional investor's large order sought to be filled on a public venue may, due to its size, have to be filled across multiple exchanges. Algorithms can

react to the order data from the first exchange and move the market in the other exchanges where the order is expected to be completed. This results in the market moving against the institutional investor (either because the stock price of its buy order went up or the stock price of its sell order went down), making the institutional investor's order less profitable when it hits the exchange. The impact of HFT on the securities markets led to a demand for ATSs, venues where large securities trade orders could be executed without immediately becoming public.[1]

Dark pool trading, as its name suggests, is supposed to be "dark." Dark pools can process "unlit" trades because federal securities regulations permit them to not disclose trade data in real time. (*See* docket 33 at 10, *comparing* 17 CFR 242.301 [requirements for alternative trading systems], *with* 17 CFR 242.602 [dissemination of quotations in NMS (National Market System) securities].) Therefore, in dark pools, the ways in which HFT can leverage technological superiority are (supposed to be) more limited. Benefits include the ability to potentially execute very large trades without moving the market before the trade is fully executed. For this reason, dark pools tend to attract some of the largest and most sophisticated securities traders, such as pension funds. These sophisticated, institutional investors are the only targets of Barclays' Dark Pool marketing materials. Hence, by definition, the type of fraud alleged here was carried out by highly sophisticated financial experts and harmed highly sophisticated financial experts. Consequently, the scope of what can be considered *material* to a decision to trade in a dark pool cannot be viewed from the perspective of a layperson. Instead, the information must be something that a trader at an institutional investor would find to be material.

In this case, the NYAG alleges that the Dark Pool was not functioning as advertised. Rather, the Dark Pool, for various alleged reasons, retained many of the downsides of trading on a public exchange. For instance, the complaint alleges that Barclays, in contravention of representations made to inves-

---

1. HFT defenders proffer myriad supposed benefits of their existence, such as increased price efficiency and liquidity. This court need not and will not weigh in on the important public policy debate over market structure, as such matters have no legal relevance to this case. HFT is a fact of life on Wall Street, and it is up to the federal securities regulators and Wall Street experts to determine sound market structure policy.

tors, was routing certain trades to the Dark Pool to be executed with an HFT counterparty, even when a better execution price could be obtained in another venue.

Here, however, it is essential to keep in mind that this lawsuit is not, nor could it be, about the legality of the trading in the Dark Pool. Rather, this case is *only* about whether Barclays' representations about the Dark Pool are fraudulent under the Martin Act. Despite the broad scope of the Martin Act, discussed below, it is a statute that only gives rise to liability when misrepresentations are made. Liability under the Martin Act does not exist simply because a bank's dark pool did not comply with federal securities regulations.[2]

Yet, the NYAG may hold financial institutions, such as Barclays, liable if they lie to investors about material facts about how their dark pool operates. As discussed below, the Martin Act *does* permit the NYAG to police dark pools in this limited manner, notwithstanding Barclays' arguments to the contrary. The very point of dark pools is to function as an alternative to the default trading realities of public exchanges. Traders are entitled to rely on material representations banks make about their dark pools. If such representations are untrue, the integrity of dark pools will be compromised and investor confidence in them will be shaken. On this motion, however, the court will not reach the issue of whether the NYAG has adequately pleaded actionable, fraudulent misrepresentations. Recent procedural developments have altered the scope of this decision.

## II. Procedural History

To explain, the NYAG commenced this action by filing a complaint (the original complaint) on June 25, 2014. (*See* docket 1.) The original complaint asserts two causes of action: (1) securities fraud under the Martin Act; and (2) persistent fraud and illegality under the Executive Law. Barclays moved to dismiss on July 24, 2014.[3] The NYAG opposed on September 16, 2014, and Barclays replied on October 7, 2014. Oral argument was held on December 18, 2014. (*See* docket 49; tr, Dec. 18, 2014.)

---

**2.** The NYAG is not suing for violations of federal securities regulations, nor could it. The NYAG lacks the authority to regulate dark pools or to determine the rules under which they may operate.

**3.** Barclays' operative opening memorandum of law is the one filed on August 8, 2014 (docket 33), which replaced its originally filed brief (docket 12) that exceeded the court's page limits.

After this motion was fully submitted, on January 21, 2015, the NYAG and Barclays each filed further motions. The NYAG moved for leave to file an amended complaint. (*See* docket 50.) Barclays moved to quash certain subpoenas served by the NYAG and for a stay of discovery. (*See* docket 55.) After multiple telephone conferences were held with the court, it was agreed that Barclays would not oppose the filing of an amended complaint and Barclays would file another motion to dismiss on the merits. (*See* docket 62 [briefing schedule].) The NYAG filed an amended complaint (the AC) on February 3, 2015. (*See* docket 72.) The court, therefore, limits this decision to the threshold issues of the applicability of the Martin Act and the Executive Law, and reserves decision on pleading sufficiency. The court will decide if the AC is sufficiently pleaded based on the parties' new round of briefing.

That being said, it should go without saying that a Martin Act claim cannot be based on representations on which no reasonable sophisticated investor (the only investors who trade in dark pools) would rely. Drafts of PowerPoint marketing decks[4] and charts labeled "sample"[5] are not actionable. Moreover, though Barclays may have colloquially referred to certain high frequency traders with seemingly derogatory words such as "toxic," that is a meaningless term. A valid fraud claim, for instance, must be based on representations about types of trading counterparties that include enough of a degree of specificity about the characteristics of the traders for the representations to be actionable, as opposed to impermissibly vague descriptions and sheer puffery. The focus is on what a reasonable, so-

---

4. PowerPoint deck *drafts* should not give rise to fraud liability. Decks are ubiquitously used in client presentations, and they are obviously edited beforehand (as opposed to bankers' internal emails, such as those cited by the NYAG). The chilling effect of knowing that a future redline of PowerPoint drafts may give rise to legal liability should not be overlooked. For instance, if a junior banking analyst decides to edit the language in the final version of a deck, a plaintiff may argue that the words in the final version are more "deceptive" than in the draft. The same holds true with the *sample* liquidity graph, discussed below. The information in the deck *actually provided to clients* was either true, false, or inactionable opinion/puffery. Fraud liability is restricted to false statements, not statements or images relatively more opaque than those contained in a prior draft.

5. The graph labeled "Sample liquidity landscape by category" (*see* docket 15 at 2) clearly does not represent what the NYAG says it does for the reasons explained in Barclays' briefs. That chart was not representing the *actual* composition of the Dark Pool's traders, and, in any event, that composition was obviously subject to change. Sophisticated investors know this. Hence, that chart is not materially misleading.

phisticated trader, trading millions of dollars, actually would consider material. The court, however, will not assess the pleading sufficiency of the AC until the parties have fully briefed the forthcoming motion to dismiss it.

As for Barclays' motion to quash, it was agreed that the motion will be decided with the NYAG's own forthcoming motion to enforce its subpoenas. (*See* docket 71.) The NYAG's motion was filed on January 30, 2015. (*See* docket 63.) Oral argument on the subpoena motions is scheduled to take place on March 11, 2015.[6] (*See* dockets 73-74.)

## III. Discussion

### A. Legal Standard

On a motion to dismiss, the court must accept as true the facts alleged in the complaint as well as all reasonable inferences that may be gleaned from those facts. (*Amaro v Gani Realty Corp.*, 60 AD3d 491 [1st Dept 2009]; *Skillgames, LLC v Brody*, 1 AD3d 247, 250 [1st Dept 2003], citing *McGill v Parker*, 179 AD2d 98, 105 [1992]; *see also Cron v Hargro Fabrics*, 91 NY2d 362, 366 [1998].) The court is not permitted to assess the merits of the complaint or any of its factual allegations, but may only determine if, assuming the truth of the facts alleged and the inferences that can be drawn from them, the complaint states the elements of a legally cognizable cause of action. (*Skillgames* at 250, citing *Guggenheimer v Ginzburg*, 43 NY2d 268, 275 [1977].) Deficiencies in the complaint may be remedied by affidavits submitted by the plaintiff. (*Amaro*, 60 AD3d at 491.) "However, factual allegations that do not state a viable cause of action, that consist of bare legal conclusions, or that are inherently incredible or clearly contradicted by documentary evidence are not entitled to such consideration." (*Skillgames*, 1 AD3d at 250, citing *Caniglia v Chicago Tribune-N.Y. News Syndicate*, 204 AD2d 233 [1st Dept 1994].) Further, where the defendant seeks to dismiss the complaint based upon documentary evidence, the motion will succeed only if "the documentary evidence utterly refutes plaintiff's factual allegations, conclusively establishing a defense as a matter of law." (*Goshen v Mutual Life Ins. Co. of N.Y.*, 98 NY2d 314, 326 [2002] [citation omitted]; *Leon v Martinez*, 84 NY2d 83, 88 [1994].)

---

**6.** Oral argument on the motion to dismiss the AC will be scheduled after the motion is fully briefed.

## B. The Martin Act

"The Martin Act—New York's 'blue sky' law—'authorizes the Attorney General to investigate and enjoin fraudulent practices in the marketing of stocks, bonds and other securities within or from New York.'" (*Assured Guar. [UK] Ltd. v J.P. Morgan Inv. Mgt. Inc.*, 18 NY3d 341, 349 [2011], quoting *Kerusa Co. LLC v W10Z/515 Real Estate Ltd. Partnership*, 12 NY3d 236, 243 [2009]; *see* General Business Law §§ 352, 353.)

> "The purpose of the Martin Act was 'to create a statutory mechanism in which the Attorney-General would have broad regulatory and remedial powers to prevent fraudulent securities practices by investigating and intervening at the first indication of possible securities fraud on the public and, thereafter, if appropriate, to commence civil or criminal prosecution.'" (*People v Credit Suisse Sec. [USA] LLC*, 46 Misc 3d 1211[A], 2014 NY Slip Op 51912[U], *3 [Sup Ct, NY County 2014, Friedman, J.], quoting *Assured*, 18 NY3d at 350-351.)

The Martin Act is not a narrow statute. Rather, the Court of Appeals has long held that the Martin Act "should be *liberally construed* to give effect to its remedial purpose of protecting the public from *fraudulent exploitation in the offer and sale of securities*." (*East Midtown Plaza Hous. Co., Inc. v Cuomo*, 20 NY3d 161, 168-170 [2012] [emphasis added], quoting *All Seasons Resorts v Abrams*, 68 NY2d 81, 86-87 [1986].) Moreover, though a cause of action under the Martin Act is a fraud claim, it is well settled that "[t]he Attorney General need not prove scienter or intent to defraud." (*People v Greenberg*, 95 AD3d 474, 483 [1st Dept 2012], citing *State of New York v Rachmani Corp.*, 71 NY2d 718, 725 n 6 [1988], *accord People v Lexington Sixty-First Assoc.*, 38 NY2d 588, 595 [1976]; *cf. Eurycleia Partners, LP v Seward & Kissel, LLP*, 12 NY3d 553, 559 [2009] ["The elements of a cause of action for (common-law) fraud (are) a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages"].) Nor need reliance be proved. (*State of New York v Sonifer Realty Corp.*, 212 AD2d 366, 367 [1st Dept 1995].)

Despite the Martin Act's exceedingly broad scope and its limited elements,[7] materiality is "an essential element" of a Martin Act claim. (*Greenberg*, 95 AD3d at 483.) That is, just as with common-law fraud claims, representations that are immaterial to an investment decision are not actionable and, thus, cannot give rise to liability under the Martin Act. Under New York law, the test for materiality is "whether defendants' representations, taken together and in context, would have [misled] a reasonable investor about the nature of the investment." (*People v Bank of N.Y. Mellon Corp.*, 40 Misc 3d 1232[A], 2013 NY Slip Op 51394[U], *13 [Sup Ct, NY County 2013, Friedman, J.] [collecting cases], quoting *Acacia Natl. Life Ins. Co. v Kay Jewelers*, 203 AD2d 40 [1st Dept 1994]; *see Rachmani*, 71 NY2d at 727 [adopting federal materiality standard].)

Barclays argues that the Martin Act is inapplicable to the allegations asserted by the NYAG in this case because the NYAG does not allege any misrepresentation related to the sale of any particular security. Instead, the NYAG only alleges that Barclays made misrepresentations about the Dark Pool itself. Barclays argues that misrepresentations about the platform or venue through which securities are traded cannot give rise to liability under the Martin Act. Barclays avers that the Martin Act's scope is limited to misrepresentations that impact an investor's decision to trade a particular security, but not misrepresentations that induce the investor to execute a desired trade on a particular platform. Stated another way, Barclays takes the position that only representations influencing the decision about the specifics of the trade (e.g., which stock to buy, how much, and at what price) are actionable, but representations influencing the separate decision as to where to execute the desired trade (e.g., which public exchange or dark pool) are not actionable. The NYAG vehemently disagrees.

This is a novel issue. The cases cited by the NYAG and Barclays are inapposite. They either do not address this specific issue or involve liability under the federal securities laws which, while similar, are neither worded identically to the Martin Act

---

7.  It should be noted that CPLR 3016 (b)'s specificity requirements apply to Martin Act claims because CPLR 3016 (b) applies to all causes of "action based upon fraud, misrepresentation, mistake, [and] willful default." (*See People v Charles Schwab & Co., Inc.*, 33 Misc 3d 1221[A], 2011 NY Slip Op 52042[U], *5-6 [Sup Ct, NY County 2011, Sherwood, J.], citing *People v Katz*, 84 AD2d 381, 385 [1st Dept 1982].) As noted earlier, the question of whether the NYAG's pleadings contain sufficient detail will be addressed on the motion to dismiss the AC.

nor must they be interpreted in accordance with the policies set forth in the cited Court of Appeals precedent.

Given the reality of how modern securities trading actually occurs—that is, how trading decisions are really made—the notion that the decision about where to execute a trade is not an "investment decision" is unpersuasive because the choice of trading platform can have a significant impact on the outcome of the trade. As discussed earlier, a substantial percentage of all securities trading is conducted by computer algorithms. HFT trades are executed in milliseconds by algorithms programmed to implement previously determined trading strategies. The profitability of algorithmic trading often has nothing to do with anything classically understood to impact corporate value. Instead, much of the profitability of algorithmic trading is predicated on finding opportunities to profit on short term market fluctuations in different venues, with the short term often being milliseconds in duration. Consequently, trading decisions can be inexorably linked to the venue in which the trade occurs, because that venue will impact the profitability of a trade based on timing and counterparty.

██ Of course, not all trades are actually influenced by choice of venue. However, this lawsuit is primarily about protecting "[l]ong-term investors [such as] mutual funds, pension funds, or retail investors trading from home" (*see* docket 36 at 10)[8] from "predatory" high frequency traders. It is alleged that the

---

**8.** The NYAG's rhetoric about the harms of HFT should be unconvincing to sophisticated readers due to the absence of any meaningful discussion of the complex trade-offs that must be considered when contemplating market structure policy. (*See e.g.* Matt Levine, *SEC Will Keep Thinking About High Frequency Trading*, Bloomberg View, June 5, 2014, available at http://www.bloombergview.com/articles/2014-06-05/sec-will-keep-thinking-about-high-frequency-trading ["The SEC's core view is that the *fundamental* business model of high frequency trading is fine. There are probably some abuses at the margins, and shedding some light on those margins will be enough to correct those abuses"].) Whether HFT is, on balance, a good thing for the market is well beyond the scope of this case and the Martin Act. This court is not influenced, nor is it moved, by the NYAG's public policy arguments (e.g., that an investor may be considered "traditional" does not warrant special protection). For the purposes of this case, either Barclays materiality lied about the Dark Pool or it did not. Moreover, even if trading within the Dark Pool violated federal securities regulations, no Martin Act liability will be found unless *Barclays actually lied to investors, in writing, about material facts concerning the Dark Pool.* The investors in the Dark Pool are highly sophisticated and, hence, no liability will be found simply on the basis of meaningless words, such as "aggressive," "predatory," and "toxic." Of course, if Barclays made actual representations to its clients about what these terms specifically mean and promised certain results (i.e., specifically prohibiting

very reason these investors wanted to trade in the Dark Pool was to try to minimize their exposure to HFT.[9] Here, where it is alleged that these investors chose to execute their trades in the Dark Pool because trading on that platform was thought to directly impact the outcome of the trades, their decision to trade in the Dark Pool is very much an investment decision.

Finally, to the extent the applicability of the Martin Act to representations about trading venues can be considered a close call—and, for what it's worth, Barclays' arguments are not entirely unreasonable—this court views the Court of Appeals' guidance on the Martin Act to be that doubts in favor of the Martin Act's applicability should be resolved in the NYAG's favor. In other words, if it is a close call, the Martin Act should be held to apply. New York, the center of the financial universe, benefits greatly from having powerful blue sky laws.

## C. Executive Law

■ The NYAG's Executive Law cause of action, on the other hand, is dismissed. "Executive Law § 63 (12) . . . *does not create independent claims,* but merely authorizes the Attorney General to seek injunctive and other relief on notice prescribed by the statute in cases involving persistent fraud or illegality." (*People v Charles Schwab & Co., Inc.,* 109 AD3d 445, 449 [1st Dept 2013]; *see People v The Trump Entrepreneur Initiative LLC,* 2014 NY Slip Op 32685[U], *7-11 [Sup Ct, NY County 2014, Kern, J.] [Executive Law § 63 (12) is "not a standalone cause of action"], *accord State of New York v Cortelle Corp.,* 38 NY2d 83, 86 [1975].)

Accordingly, it is ordered that the motion by defendants Barclays Capital Inc. and Barclays PLC to dismiss the NYAG's original complaint is decided as follows: the Executive Law

---

trades with counterparties bearing specific, objectively identifiable characteristics), such lies could be actionable.

9. One wonders that, if not for the existence of HFT in the Dark Pool, whether these investors could possibly have processed their desired order volume in the Dark Pool, or without HFT, would the resulting diminished liquidity of the Dark Pool necessarily have required the investors to execute in other venues, where they might have ended up trading with those same HFT counterparties anyway. This, of course, is a question of fact that cannot be resolved on a motion to dismiss. It is, however, a broader conceptual question to keep in mind when considering who was harmed by the alleged wrongdoing in this case and whether proximately caused damages were suffered. It also should be noted that, while not preclusive of this case, investors in the Dark Pool have commenced class action litigation against Barclays. (*See In re: Barclays Liquidity Cross & High Frequency Trading Litig.,* 67 F Supp 3d 1375, 2014 WL 7180624 [JPML Dec. 12, 2014].)

cause of action is dismissed with prejudice, dismissal based on the inapplicability of the Martin Act is denied, and a ruling on whether the NYAG has validly pleaded a cause of action under the Martin Act will be made based on the forthcoming motion practice over the amended complaint.