■ In the Matter of THE PEOPLE OF THE STATE OF NEW YORK, by ERIC T. SCHNEIDERMAN, as Attorney General of the State of New York, Appellant-Respondent, v THE TRUMP ENTREPRENEUR INITIATIVE LLC, Formerly Known as TRUMP UNIVERSITY LLC, et al., Respondents-Appellants. [26 NYS3d 66]—

---

Order, Supreme Court, New York County (Cynthia S. Kern, J.), entered October 15, 2014, which, to the extent appealed from as limited by the briefs, granted respondents' motions for summary dismissal of the first cause of action, alleging fraud under Executive Law § 63 (12), denied petitioner's motion for a summary determination as to its common-law fraud claim, denied respondents' motion to convert this special proceeding into a plenary action or for leave to conduct additional discovery as to the remaining causes of action, and granted petitioner's motion to strike certain of the Trump respondents' affirmative defenses, unanimously modified, on the law, to deny the motion to dismiss the first cause of action, and otherwise affirmed, without costs. Appeals from order, same court and Justice, entered January 31, 2014, unanimously dismissed, without costs, as moot.

The New York State Attorney General brings this proceeding against Donald J. Trump individually and against several business entities bearing his name: The Trump Entrepreneur Initiative LLC, DJT Entrepreneur Member LLC, DJT Entrepreneur Managing Member LLC, The Trump Organization, Inc., Trump Organization LLC, (collectively, the Trump respondents). Trump is the Chief Executive Officer of The Trump Organization, Inc. and Trump Organization LLC. He was also the chairman of Trump University, later known as Trump Entrepreneur Initiative LLC (TEI).

In 2004, Trump, along with respondent Michael Sexton and a nonparty individual, incorporated Trump University LLC as a New York limited liability company. Trump University purported, by way of seminars and mentoring programs, to instruct small business owners and individual entrepreneurs in real estate investing.

By letter dated May 27, 2005, the New York State Department of Education (SED) notified Donald Trump individually, Sexton, and Trump University that they were violating the New York Education Law by using the word "University" when it was not actually chartered as one. Likewise, SED notified these respondents that Trump University was also violating the Education Law because it lacked a license to offer student instruction or training in New York State. SED stated, however, that Trump University would not be subject to the license requirement if it had no physical presence in New York State, moved the business organization outside of New York, and ceased running live programs in the State. In June 2005,

Sexton informed SED that Trump University would merge its operation into a new Delaware LLC, and would indeed cease holding live programming in New York State.

However, the Attorney General alleges, Trump University failed to abide by any of these conditions. To the contrary, it is alleged that, despite Sexton's assurances to the Attorney General, SED learned in 2009 through newspaper advertisements and a student complaint to the New York State Attorney General that Trump University was continuing to provide live programming and instruction in New York without obtaining proper licensing or moving its operations out of New York. In March 2010, SED sent Trump University another letter demanding that it cease using the word "University" in its name. In May 2010, five years after SED had informed respondents that they were obliged to drop the word "University," Trump University filed a certificate of amendment to its Articles of Organization, thus formally changing its name to TEI.

In August and September 2010, SED once again informed TEI that the company needed a license to operate, which it still did not have despite having been notified in 2005 that its failure to obtain a license violated New York State law. On October 7, 2010, Sexton informed SED that TEI had ceased operations.

In early 2011, the Attorney General commenced an investigation into for-profit universities and trade schools operating in New York, and in May 2011, issued TEI a subpoena seeking information pertaining to its business practices.

In August 2013, the Attorney General commenced this special proceeding under Executive Law § 63 (12) for injunctive relief, restitution, disgorgement, damages, and civil penalties. In its supporting affirmation, the Attorney General alleged that between 2005 and 2011, respondents operated an unlicensed, illegal educational institution. Further, the Attorney General stated, through various fraudulent practices, respondents intentionally misled more than 5,000 students nationwide, including over 600 New York residents, into paying as much as $35,000 each to participate in live seminars and mentor programs that the students thought were part of a licensed university.

According to the Attorney General's affirmation, respondents represented in advertising that real estate experts handpicked by Trump himself would teach his strategies and techniques for real estate investing, and that these strategies would lead to success. One advertisement offered a free workshop and

referred to "Donald Trump's handpicked experts." The same advertisement bore a quotation attributed to Trump, stating, "I can turn anyone into a successful real estate investor, including you." Similarly, a direct mail solicitation sent to prospective students read, "In just 90 minutes, my hand-picked instructors will share my techniques, which took my entire career to develop" and went on to state, "Then just copy exactly what I've done and get rich." The Attorney General noted that at the free seminars, instructors played a video featuring Donald Trump telling prospective students, "We're going to have professors that are absolutely terrific—terrific people, terrific brains, successful, the best" and noted that they were "all people that are handpicked by me."

However, the Attorney General averred, Trump did not handpick the instructors; indeed, only one of the live event speakers for Trump University had even ever met Donald Trump. Nonetheless, some students purchased seminars on the basis of their belief that Trump had approved each instructor. In an affidavit submitted to the Attorney General, one student stated that he "had some trust in the program because it was run by Donald Trump" and was "led to believe that . . . based on Trump's marketing materials, the course professors had been handpicked by Donald Trump." Similarly, the Attorney General stated, Donald Trump never participated in the creation of any instructional content and never reviewed any curricula. The Attorney General further maintained that the instructors had been inadequately vetted and in fact had little or no experience in real estate investing, instead having prior work experience such as food service management and graphic design.

What is more, according to the Attorney General, the free seminars were merely an instrument through which instructors would induce students to enroll in increasingly expensive seminars, starting with a three-day $1,495 seminar. The Attorney General averred that although Trump University speakers represented that the three-day seminar would teach students all they needed to know to be successful real estate investors, the instructors at those three-day seminars then engaged in a "bait and switch," telling students that they needed to attend yet another seminar for an additional $5,000 in order to learn more about particular lenders. Instructors at the three-day seminars are also alleged to have engaged in a bait-and-switch by urging students to sign up for "Trump mentorship packages, which ranged anywhere from $10,000 to $35,000" and supposedly provided "the only way to succeed in real estate investment."

The Attorney General also averred that individual respondents Donald Trump and Michael Sexton were each personally involved with the founding of Trump University. Trump, the Attorney General maintains, conceded that he had "significant involvement with both the operation and overall business strategy of Trump University," including "attending frequent meetings" with Sexton to "discuss Trump University operations." Further, Trump's photographs and signature appeared on all of Trump University's advertising; according to testimony from Sexton, Trump personally reviewed and approved all the ads that were in the newspapers. Sexton oversaw all operations, including but not limited to Trump University's finances, curriculum development, scheduling and execution of the seminars and mentorship programs, and reporting to the employees of The Trump Organization and Donald Trump.

On the basis of these allegations, the Attorney General interposed causes of action for fraud under Executive Law § 63 (12) (first cause of action); fraudulent and deceptive practices under General Business Law § 349 (second cause of action); false advertising under General Business Law § 350 (third cause of action); violating Education Law § 224 by calling the business "Trump University" when it was not, in fact, chartered as a university (fourth cause of action); violating Education Law § 5001 *et seq.* by operating an unlicensed school that did not meet State standards (fifth cause of action); and violating 16 CFR § 429, which, in connection with a contract of sale, obliges a seller to include the buyer's right to cancel the transaction within three days (sixth cause of action).

Respondents moved to dismiss the petition, arguing, among other things, that the first cause of action under Executive Law § 63 (12) was untimely under CPLR 214 (2), which imposes a three-year statute of limitations to recover on wrongs "created or imposed by statute." In addition, respondents argued, the Attorney General did not adequately plead the elements of common-law fraud, so could not proceed under the six-year statute of limitations governing that action.

In its January 2014 order, the court dismissed the fourth cause of action (the Education Law § 224 violation) in its entirety, and held that the Attorney General was bound by a three-year statute of limitations on all the statutory claims in the petition. However, the court also held that the Attorney General's general fraud claims were sufficiently pleaded, and therefore were viable and subject to the six-year statute of limitations governing fraud actions.

Respondents then filed verified answers and the Trump

respondents asserted 17 affirmative defenses. Respondents also moved to convert the special proceeding to a plenary action, or, in the alternative, for leave to conduct discovery on the remaining causes of action. For its part, the Attorney General re-noticed the petition and sought a summary determination on its remaining causes of action for violations of Executive Law § 63 (12), General Business Law §§ 349 and 350, Education Law §§ 5001 through 5010, and 16 CFR § 429.

By order entered October 15, 2014, the IAS court denied respondents' motion for an order converting the special proceeding to a plenary action. Further, the IAS court granted respondents' motion to dismiss the first cause of action, the fraud claim under Executive Law § 63 (12) (as opposed to the common law fraud), stating that the statute does not provide a standalone cause of action for fraud, citing *People v Charles Schwab & Co., Inc.* (109 AD3d 445, 449 [1st Dept 2013]). The court also denied the Attorney General's request for a summary determination against the Trump respondents, except with respect to the fifth cause of action for violation of Education Law §§ 5001 through 5010. Likewise, the court granted respondents' motion to dismiss the sixth cause of action for violation of 16 CFR § 429. Finally, the court granted respondents' motion for discovery to a limited extent, and granted the Attorney General's motion to strike the affirmative defenses to a limited extent.

Before reaching the issue of whether a fraud claim under Executive Law § 63 (12) is subject to the three-year statute of limitations imposed under CPLR 214 (2), we must address an apparent anomaly in our case law—specifically, *People v Charles Schwab & Co., Inc.* (109 AD3d 445, 449 [1st Dept 2013], *supra*). First of all, Executive Law § 63 (12) states, in relevant part: "Whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney general may apply, in the name of the people of the state of New York, to the supreme court of the state of New York, on notice of five days, for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts [and] directing restitution and damages . . . and the court may award the relief applied for or so much thereof as it may deem proper." Moreover, the provision defines "fraud" as "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions" (*id.*).

In *Charles Schwab*, the Attorney General had brought an enforcement action asserting claims under section 63 (12) and the Martin Act (General Business Law art 23-A), alleging that Charles Schwab had misrepresented the risks of certain securities when offering them to investors. The IAS court allowed the Martin Act claim to proceed. But the court dismissed the section 63 (12) claim, not on the ground that section 63 (12) foreclosed a standalone action, but rather, on the ground that the cause of action alleging violation of that section "d[id] not adequately state a violation of the Executive Law" (*People v Charles Schwab & Co., Inc.*, 33 Misc 3d 1221[A], 2011 NY Slip Op 52042[U], *9 [Sup Ct, NY County 2011], *affd in part, mod in part* 109 AD3d 445 [2013]).

On appeal to this Court, neither party raised or briefed the issue of whether the Attorney General could bring a standalone action under section 63 (12), and, as noted, the IAS court had not dismissed the claim on that basis. Nonetheless, in a memorandum decision, we found that the IAS court had properly dismissed that claim, stating that the section "does not create independent claims, but merely authorizes the Attorney General to seek injunctive and other relief on notice prescribed by the statute in cases involving persistent fraud or illegality" (*People v Charles Schwab & Co., Inc.*, 109 AD3d at 449, citing *State of New York v Cortelle Corp.*, 38 NY2d 83, 86 [1975]).

Although the holding of *Charles Schwab* purported to be based on the Court of Appeals' ruling in *Cortelle*, *Cortelle* does not, in fact, hold that the Attorney General cannot bring a standalone cause of action for fraud under Executive Law § 63 (12). Instead, *Cortelle* addressed the statute of limitations for a section 63 (12) claim—namely, the applicability of CPLR 214 (2), which provides a three-year statute of limitations for "an action to recover upon a liability, penalty or forfeiture created or imposed by statute."

In *Cortelle*, the Attorney General, alleging that the defendants had engaged in fraudulent loan practices, sought restitution for defrauded persons and an injunction against certain practices under section 63 (12), among other remedies. The trial court found that the action was one to recover upon a "liability, penalty or forfeiture created or imposed by statute" and therefore was subject to CPLR 214 (2)'s three-year statute of limitations; on that basis, the trial court dismissed several causes of action, including the one brought under section 63 (12) (*see State of New York v Cortelle Corp.*, 73 Misc 2d 352, 355 [Sup Ct, Nassau County 1972]). The Second Department affirmed without an opinion (*see* 43 AD2d 668 [2d Dept 1973]).

The Court of Appeals reversed the statute of limitations ruling and reinstated the dismissed causes of action, including the cause of action for restitution under section 63 (12), finding that the causes of action addressing the defendant's allegedly fraudulent practices did not rely on liabilities, penalties, or forfeitures created or imposed by statute. Specifically, the Court noted, section 63 (12) "did not 'make' unlawful the alleged fraudulent practices, but *only provided standing in the Attorney-General to seek redress and additional remedies for recognized wrongs which pre-existed the statute*[ ]" (*Cortelle*, 38 NY2d at 85 [emphasis added]).

The disagreement over *Cortelle*'s holding apparently arises from the Court of Appeals' statement that the statute "only provided standing in the Attorney General to seek redress and additional remedies for recognized wrongs which pre-existed the statute[ ]." However, in using this language, the Court of Appeals did not suggest that the Attorney General had no power to commence a standalone action under Executive Law § 63 (12). Rather, the Court's statement was directed to a specific issue—that is, whether the Attorney General was pursuing a claim that existed only under section 63 (12). This question was relevant because the answer would determine whether the Court was obliged to dismiss the action on statute of limitations grounds.

The Court answered the question in the negative, finding that in fact, the allegations of the Attorney General's section 63 (12) cause of action amounted essentially to a common-law claim of promissory fraud—a cause of action that had certainly existed before section 63 (12) was implemented. Framing the issue in this light, the Court found that the Attorney General sought redress for a wrong that had long been actionable under the common law; thus, the cause of action did not depend on a *new* liability "created or imposed by statute" within the meaning of CPLR 214 (2). Accordingly, the Court concluded, given the allegations in the case, the Attorney General had standing under section 63 (12) to bring the fraud action and could rely on the statute's particular remedies without being subject to the three-year time limitation set forth in CPLR 214 (2).

To be sure, *Cortelle* does not directly address whether section 63 (12) provides for an independent cause of action under the broad definition of fraud. Other New York courts addressing that issue, however, do give us guidance as to how we should proceed here. New York courts have generally allowed for independent causes of action for fraud under section 63 (12) (*see e.g. People v Greenberg*, 21 NY3d 439 [2013], *affg* 95 AD3d

474 [1st Dept 2012] [in a case involving claims for violation of § 63 (12) and the Martin Act, as well as common-law fraud, the Court of Appeals did not dismiss the § 63 (12) fraud claim or otherwise limit it to a common-law fraud claim]).

Likewise, before *Schwab*, other decisions from this Court have allowed for independent causes of action for fraud under section 63 (12) (*see People v Wells Fargo Ins. Servs., Inc.*, 62 AD3d 404 [1st Dept 2009], *affd* 16 NY3d 166 [2011] [dismissing cause of action for fraud under § 63 (12) because complaint failed to state it with sufficient particularity, not because no such claim is allowed]; *People v Coventry First LLC*, 52 AD3d 345, 346 [1st Dept 2008], *affd* 13 NY3d 108 [2009] [finding that a "cause of action" under § 63 (12) was "sufficiently stated" even though the elements of common-law fraud "need not be alleged," where case also involved a separate common law fraud claim]; *People v Apple Health & Sports Clubs*, 206 AD2d 266, 267 [1st Dept 1994], *lv dismissed in part and denied in part* 84 NY2d 1004 [1994] [special proceeding alleging repeated fraudulent and deceptive conduct brought under section 63 (12) alone]; *accord State of New York v Grecco*, 21 AD3d 470 [2d Dept 2005]; *Matter of People v JAG NY, LLC*, 18 AD3d 950 [3d Dept 2005]; *but see Matter of People v Frink Am.*, 2 AD3d 1379 [4th Dept 2003]).

Further, one decision from this Court has held that fraud under section 63 (12) may be established without proof of scienter or reliance (*People v American Motor Club*, 179 AD2d 277, 283 [1st Dept 1992], *appeal dismissed* 80 NY2d 893 [1992] [reinstating a section 63 (12) claim "as a cause of action," where the AG had pleaded facts amounting to fraud under that provision, as under the statute, "scienter is not required and false promises are sufficient"]). This case, which concluded that fraud under section 63 (12) may be established without proof of scienter or reliance, further indicates that the Attorney General may rely on section 63 (12) for a cause of action and need not limit itself to claims for common-law fraud only.

Thus, *Charles Schwab* does not comport with prevailing authority, and in fact, acts to limit the power that the Attorney General has long been exercising under section 63 (12). And even apart from prevailing authority, the language of the statute itself appears to authorize a cause of action; like similar statutes that authorize causes of action, section 63 (12) defines the fraudulent conduct that it prohibits, authorizes the Attorney General to commence an action or proceeding to foreclose that conduct, and specifies the relief, including equitable relief, that the Attorney General may seek. Indeed, the

language of section 63 (12) parallels the language of the Martin Act,* under which the Attorney General is undisputedly authorized to bring a standalone cause of action for fraudulent conduct in the securities context (*compare* General Business Law § 353 [1] *with* Executive Law § 63 [12]; *see Assured Guar. [UK] Ltd. v J.P. Morgan Inv. Mgt. Inc.*, 18 NY3d 341, 350 [2011]).

As one jurist has observed, "[T]here is no requirement that a patent judicial mistake be allowed to 'age' before it may be corrected" (*Doerr v Goldsmith*, 25 NY3d 1114, 1154 [2015] [Fahey, J., dissenting]). Hence, we hold that the Attorney General is, in fact, authorized to bring a cause of action for fraud under Executive Law § 63 (12).

Turning now to the statute of limitations issue, we find, for the reasons already stated, that the fraud claim under section 63 (12) is not subject to the three-year statute of limitations imposed by CPLR 214 (2), but rather, is subject to the residual six-year statute of limitations in CPLR 213 (1) (*see Morelli v Weider Nutrition Group*, 275 AD2d 607, 608 [1st Dept 2000]). As concluded above, section 63 (12) does not create any liability nonexistent at common law, at least under the court's equitable powers. As also concluded above, section 63 (12) does not encompass a significantly wider range of fraudulent activities than were legally cognizable before the section's enactment (*see State of New York v Bronxville Glen I Assoc.*, 181 AD2d 516 [1st Dept 1992]; *cf. Gaidon v Guardian Life Ins. Co. of Am.*, 96 NY2d 201, 209 [2001]; *but see State of New York v Daicel Chem. Indus., Ltd.*, 42 AD3d 301 [1st Dept 2007]).

Nevertheless, petitioner is not entitled to summary determi-

---

* The Martin Act reads, in relevant part: "Whenever the attorney-general shall believe from evidence satisfactory to him that any person, partnership, corporation, company, trust or association has engaged in, is engaged or is about to engage in any of the practices or transactions heretofore referred to as and declared to be fraudulent practices, he may bring an action in the name and on behalf of the people of the state of New York against such person, partnership, corporation, company, trust or association . . . to enjoin such person, partnership, corporation, company, trust or association . . . from continuing such fraudulent practices or engaging therein or doing any act or acts in furtherance thereof or, if the attorney-general should believe from such evidence that such person, partnership, corporation, company, trust or association actually has or is engaged in any such fraudulent practice, he may include in such action an application to enjoin permanently such person, partnership, corporation, company, trust or association, and such other person or persons as may have been or may be concerned with or in any way participating in such fraudulent practice, from selling or offering for sale to the public . . . In said action an order or a judgment may be entered awarding the relief applied for or so much thereof as the court may deem proper." (General Business Law § 353 [1].)

nation of its fraud claims, under either the common law or the statute, because material issues of fact exist as to those claims.

Contrary to respondents' arguments, the IAS court correctly dismissed the seven affirmative defenses at issue. This conclusion holds particularly true because the court should have considered the allegations of post-May 31, 2010 conduct included in petitioner's reply submission (*see Matter of Kennelly v Mobius Realty Holdings LLC*, 33 AD3d 380, 381-382 [1st Dept 2006]; *State of New York v Metz*, 241 AD2d 192, 198-199 [1st Dept 1998]).

Finally, the IAS court correctly denied respondents' motion to convert the special proceeding into a plenary action, and the court's discovery rulings were well within its broad discretionary power to control the special proceeding. Concur—Mazzarelli, J.P., Renwick, Saxe and Moskowitz, JJ.

