People v Mashinsky (2023 NY Slip Op 50826(U))

[*1]

People v Mashinsky

2023 NY Slip Op 50826(U)

Decided on August 4, 2023

Supreme Court, New York County

Chan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on August 4, 2023
Supreme Court, New York County

The People of the State of New York by Letitia James, 
 Attorney General of the State of New York, Plaintiff,

against
Alex Mashinsky, Defendant.

Index No. 450040/2023

For Plaintiff: Letitia James, Attorney General of the State of New York, 28 Liberty Street, New York, New York 10005 (Shamiso Maswoswe, Kenneth J. Haim, Matthew Woodruff, Tanya Trakht, Jesse A. Devine)
For Defendant: Yankwitt LLP, 140 Grand Street, Suite 705, White Plains, New York 10601 (Benjamin R. Allee, Cassandra M. Vogel)

Margaret A. Chan, J.

The following e-filed documents, listed by NYSCEF document number (Motion 001) 12, 13, 14, 15 were read on this motion to/for DISMISS.
The New York State Attorney General (NYAG) commences this action on behalf of the People of the State of New York against defendant Alex Mashinsky (Mashinsky) based on an alleged scheme by Mashinsky to defraud investors by inducing them, through false and misleading statements, to deposit their digital assets with his now-bankrupt company, Celsius Network LLC (Celsius) (NYSCEF No. 7 — the Complaint or AC). Mashinsky moves pursuant to CPLR 3211(a)(7) and (10) for an order dismissing the Complaint (NYSCEF # 12). NYAG opposes the motion. For the following reasons, Mashinsky's motion is denied.
Background[FN1]
Celsius Network and its "Earn" Program
Founded in March 2017, Celsius is a cryptocurrency lending company that offers [*2]customers a variety of cryptocurrency-related products and services (AC ¶¶ 1, 17, 19-20, 21). Mashinsky is Celsius's co-founder, majority owner, and former Chief Executive Officer (CEO), and as alleged, he had access to and control over Celsius's overall operations, trading, and corporate strategy (id. ¶¶ 13, 17, 19).
Celsius's flagship product was its "Earn" program (AC ¶ 22). To access Celsius's product offerings (including the "Earn" program), customers created a Celsius account, digitally signed Celsius's user agreement, and acknowledged its terms of use (id. ¶ 20). After creating an account, Celsius users could deposit existing cryptocurrencies from their own digital wallets into earned interest accounts (EIAs) (id. ¶¶ 21-22). Users would then obtain returns from Celsius through a "sleep to earn" model tied to the EIAs (id. ¶ 24). Specifically, Celsius pooled the digital assets deposited in the EIAs and invested them in various revenue-generating activities to deliver returns for investors (id. ¶¶ 23-24).[FN2]
The yield rates for EIAs changed on a weekly bass and were, according to Mashinsky, "calculated by the weekly demand for [cryptocurrencies] combined with [Celsius's] promise that up to 80% of [its] profits are returned to the depositors" (id. ¶ 22). At least 26,390 New York residents registered as users of Celsius and 4,000 of those users were enrolled in EIAs (id. ¶ 25).
Mashinsky's Representations Concerning Celsius's Business
Mashinsky acted as Celsius's primary promoter and spokesman across several types of forums, including YouTube, Twitter, and various cryptocurrency conferences (AC ¶ 26). As is relevant here, one of Mashinsky's primary mediums for promoting Celsius was his weekly "Ask Mashinsky Anything" (AMA) segments that were conducted at his New York City apartment (id.). During these segments, Mashinsky reviewed and responded to viewers' questions in real time (id.). Recordings of the AMA segments were then posted on both YouTube and Celsius's website (id. ¶ 27). The videos also often included links to Celsius's website and app so that viewers could invest with Celsius (id. ¶ 30).
NYAG alleges that, in promoting Celsius between 2019 and 2022, Mashinsky repeatedly misled the public about various aspects of the company's business model and operations (see AC ¶¶ 34-38, 40-43, 47-51, 52-60, 70-79, 94-95). The court provides a brief recitation of certain alleged instances of misrepresentations and omissions recounted in the Complaint:
• Mashinsky repeatedly represented that cryptocurrencies deposited with Celsius would be as safe as any asset deposited with banks or securities broker-dealers (AC ¶¶ 35-37). Unlike those institutions, however, Celsius did not have access to deposit or investor insurance, nor was Celsius subject to the same regulatory oversight as these other institutional entities (id. ¶¶ 36, 38).
• Mashinsky indicated that Celsius had a userbase of two million people who had earned yields (AC ¶¶ 41-42). But when he made that statement, approximately two-thirds of Celsius's users held less than a dollar's worth of cryptocurrency in their accounts (id. ¶ 43). As one Celsius employee indicated, although Celsius had "1.8mm registered users," "many of [them] have not transferred assets and therefore would not have earned yield (id. ¶ 42).
• Mashinsky purportedly claimed in blogposts and interviews between 2019 and 2022 that Celsius would generate yields by making collateralized loans to reputable institutions [*3]and cryptocurrency exchanges (AC ¶¶ 44, 47). He further represented that Celsius did not engage in unsecured lending (id. ¶¶ 47-50). Yet between 2020 and 2022 Celsius increased its exposure to uncollateralized loans (id. ¶¶ 46, 51). In 2020 Celsius made almost $10 million in uncollateralized loans and by May 2022, uncollateralized loans made up 35% of Celsius's portfolio (see id. ¶ 51).
• In March 2018, Celsius launched its CEL token—which it viewed as the "backbone" of the Celsius platform—and offered it for sale to investors through an initial coin offering (AC ¶¶ 107, 108). For his part, Mashinsky promoted the CEL token and its value but did not disclose that Celsius was spending millions of dollars to support the token (id. ¶¶ 108-109). And despite publicly claiming that he was not a seller of the CEL token, Mashinsky purportedly sold 2.8 million in 2021 (worth $16 million) and 25 million in CEL tokens in 2022 (worth $68.7 million), thereby benefiting from his promotion of the CEL token's value (id. ¶¶ 109-11).
• As Celsius's EIAs drew the attention of securities regulators, Mashinsky claimed that none of them had identified any issues despite the existence of multiple active and continuing investigations (AC ¶¶ 112-115). Mashinsky also purportedly misrepresented that Celsius was registered with the Securities and Exchange Commission (SEC) (id. ¶ 116).
The above-alleged misrepresentations and omissions were not the only types made by Mashinsky concerning Celsius. In fact, the Complaint avers that Mashinsky also purportedly misrepresented the nature of Celsius's investment and deployment strategies, as well as the resulting losses that the company had sustained. Among other statements, Mashinsky asserted that Celsius did not engage in risky strategies with users' assets, and that the company would generate high yields through low-risk investments (see AC ¶ 45). But Mashinsky would later affirm that he knew that Celsius's trading business was "volatile, risk based, capital intensive and unprofitable" (id. ¶ 46). For instance, Mashinsky claimed that Celsius's exposure in the "high-risk" decentralized finance (DeFi) market was minimal,[FN3]
yet Celsius had deployed nearly 30% of its investors' digital assets into DeFi activities by spring 2022 (AC ¶¶ 53-60). Mashinsky also purportedly downplayed the losses that Celsius experienced on the DeFi market (id. ¶¶ 55-58).
Moreover, although he represented that Celsius only lent assets to institutional counterparties, Mashinsky allegedly failed to disclose that Celsius also engaged with high-risk counterparties that resulted in losses to the company (AC ¶¶ 61-79). Among other things, Mashinsky did not disclose that Celsius took loans from Equities First Holdings, which were collateralized with investor cryptocurrency, or that, after its repayment of the loan, Celsius was unable to reobtain approximately $500 million worth of its collateral (see id. ¶¶ 62-63).[FN4]
Instead, Mashinsky represented that Celsius never had an institution not return collateral that was lent to it (id. ¶ 63).
Meanwhile, Mashinsky represented that Celsius did not engage in directional and proprietary trading of assets such as Bitcoin (AC ¶¶ 65-66). Yet Mashinsky seemingly did not disclose that, as Bitcoin prices began dropping in or around January 2022, he directed Celsius employees to sell large amounts of Bitcoin in a practice that conflicted with the "delta-neutral" trading strategy relayed to the public (see id. ¶¶ 67-68). This decision to "trad[e] around the hedges" was notable because, when Bitcoin prices recovered, Celsius was forced to cover its short position and incur losses (see id. ¶¶ 67, 69).
Mashinsky's Representations Concerning Celsius's Exposure to the Cryptocurrency Crash of May and June 2022
Beginning in May 2022, following the collapse of the Terra and Luna stablecoins created by Terraform Labs,[FN5]
 the cryptocurrency market experienced a crash (the Crash) (AC ¶¶ 74, 80). The values of nearly all digital assets fell, erasing tens of billions of dollars in cryptocurrency market capitalization (id. ¶ 80). With the cryptocurrency market in turmoil, Mashinsky allegedly misled investors about the safety of cryptocurrency assets held at Celsius in an effort to assuage investor concerns (see AC ¶¶ 81-83). Specifically, after Celsius investors withdrew over half a billion dollars from the platform in or around May 12, 2022, Mashinsky stated that Celsius was "stronger than ever" and had "billions of dollars in liquidity" (id.). In realty, Celsius was insolvent: it had total assets of less than $12 billion and total liabilities of more than $12.75 billion (an approximately $820 million negative delta) (id. ¶¶ 84-85). Also, during this same time, customer withdrawals caused Celsius to experience losses of over $1.4 billion in assets (id. ¶ 85).
In an effort to mitigate this undisclosed liquidity crises, Mashinsky solicited new investors by offering a bonus for joining Celsius, resulting in the company adding $900 million worth of cryptocurrency and two thousand new investors (id. ¶¶ 86-88). While doing so, Mashinsky downplayed Celsius's exposure to the Crash (AC ¶ 90-93). For example, even though Celsius suffered losses from the collapse of Terra and Luna, Mashinsky claimed during a June 1, 2022, YouTube interview that Celsius experienced "very small losses" (id. ¶¶ 90-91, 93). Mashinsky purportedly did not disclose that Celsius lost almost $18 million in its investment of $935 million worth of investor's assets into Terra (id. ¶ 92). Mashinsky similarly downplayed the exposure suffered by Celsius through its investment activities with other entities severely impacted by the Crash (id. ¶¶ 93-95).
Mashinsky's Representations About Celsius's Financial Health After the Crash
In an AMA conducted on June 1, 2022, Mashinsky continued to downplay Celsius's insolvency issues, stating that Celsius's investors' funds were safe and that "anyone who wanted to withdraw partially or fully" could do so (AC ¶¶ 96-97). Mashinsky doubled down on this position on June 10, 2022, when he stated that Celsius had billions in liquidity and that there would be no limits on withdrawals (id. ¶ 98). Yet, just days prior to making these statements, Celsius allegedly had less than $11 billion in total assets and $11.9 billion in total liabilities (id. ¶¶ 97, 104). Moreover, for four out of the prior six weeks, Celsius was experiencing negative weekly gross revenue, and thus it was paying EIA investors more in interest than it was [*4]generating in income (id. ¶ 102). As alleged, Mashinsky never disclosed any of this information during his interviews (id. ¶¶ 101, 104).
On June 12, 2022, Celsius paused investor withdrawals in an effort to stabilize its liquidity and operations and to preserve and protect assets (AC ¶ 100). This pause came after investors had withdrawn over $672 million in cryptocurrency between June 10 and June 12, 2022 (id. ¶ 105). The next day, on July 13, 2023, Celsius filed for bankruptcy with over $4.7 billion in investor liabilities and only $1.75 billion in cryptocurrency assets (id.).
Mashinsky's Purported Failure to Register as a Securities and Commodities Broker-Dealer or Salesperson
The Complaint avers that, despite promoting EIAs through AMAs, interviews, and website postings, Mashinsky never filed a registration statement with NYAG prior to engaging in such conduct (AC ¶¶117-123). The Complaint further states that, despite offering various cryptocurrencies for sale on behalf of Celsius through commodity contracts, Mashinsky failed to register with NYAG as a commodity broker-dealer and salesperson (id. ¶¶126-128).
Legal Standards
CPLR 3211(a)(7) provides that a party may move for judgment dismissing one or more causes of action when a pleading "fails to state a cause of action" (CPLR 3211 [a] [7]). On a motion to dismiss pursuant to CPLR 3211(a)(7), the court "must accept as true the facts as alleged in the complaint and submissions in opposition to the motion, accord [the non-movant] the benefit of every possible favorable inference and determine only whether the facts as alleged fit within any cognizable legal theory" (Whitebox Concentrated Convertible Arb. Partners, L.P. v Superior Well Servs., Inc., 20 NY3d 59, 63 [2012] [internal quotation omitted]; accord Pavich v Pavich, 189 AD3d 548, 549 [1st Dept 2020]). "[W]hether a plaintiff . . . can ultimately establish its allegations is not taken into consideration in determining a motion to dismiss" (Phillips S. Beach LLC v ZC Specialty Ins. Co., 55 AD3d 493, 497 [1st Dept 2008], lv denied 12 NY3d 713 [2009]). However, the court need not accept "conclusory allegations of fact or law not supported by allegations of specific fact" (Wilson v Tully, 243 AD2d 229, 234 [1st Dept 1998]).
Under CPLR 3211(a)(10), a party may move to dismiss on the basis that "the court should not proceed in the absence of" a necessary party (CPLR 3211 [a] [10]). CPLR 1001(a), in turn, defines necessary parties as either "[p]ersons [or entities] who ought to be parties if complete relief is to be accorded between the persons who are parties to the action or [persons or entities] who might be inequitably affected by a judgment in the action." And as set forth in CPLR 1003, "[n]on-joinder of a party who should be joined under section 1001 is a ground for dismissal of an action without prejudice unless the court allows the action to proceed without that party under the provisions of [CPLR 1001(b)]."
Discussion
NYAG's Complaint advances seven causes of action against Mashinsky under the Martin Act and Executive Law § 63(12). Specifically, NYAG alleges (1) violations of Sections 352, 353, and 352-c(1) of the Martin Act (Counts I & II); (2) a violation of the Martin Act's registration requirements under General Business Law § 359-e (Count III); and (3) various claims for repeated and persistent fraud and/or illegality under Executive law § 63(12), all of which are premised on Mashinsky's alleged violations of the Martin Act (Counts IV-VII) (see AC ¶¶ 132-51).
Mashinsky now moves to dismiss (NYSCEF # 12). In his moving papers, Mashinsky advances six primary bases for dismissal (NYSCEF # 13 — MOL at 6). First, Mashinsky [*5]contends that the EIAs are not securities under the Martin Act (id. at 6-9). Second, Mashinsky avers that none of his alleged misstatements are "related" to the "issuance, exchange, purchase, or other enumerated actions taken with securities or commodities" under the Martin Act (id. at 9-11). Third, Mashinsky argues that the Martin Act fraud claims fail because, inter alia, the alleged fraud is not pleaded with particularity and, in any event, none of the alleged fraud is actionable (id. at 11-19). Fourth, Mashinsky maintains that NYAG fails to establish that that Mashinsky is a securities or commodities dealer or salesperson (id. at 19-21). Fifth, Mashinsky argues that NYAG's Executive Law § 63(12) claims fail for the same reasons as the Martin Act claims (id. at 23). Finally, Mashinsky contends that NYAG has failed to name Celsius as a necessary party (id. at 21-23).
Below, the court addresses each of Mashinsky's bases for dismissal.
I. Are Earned Interest Accounts Securities Under the Martin Act?
The Martin Act prohibits fraudulent or misleading practices and representations by any person or entity who is "engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities" (General Business Law (GBL) § 352-c[1]). The statute, in turn, defines "securities" as, among other things, "any stocks, bonds, notes, evidences of interest or indebtedness or other securities . . . ." (id. § 352[1]).
Courts in New York apply a two-fold analysis to determine whether a transaction constitutes a security under the Martin Act. Courts will first assess whether a transaction falls within the definition of a security that is enumerated in the statute's definitional section (People ex rel. Schneiderman v Bank of New York Mellon Corp., 40 Misc 3d 1232[A], at *3 [Sup Ct, NY County, Aug. 5, 2013]. If , like here, the transaction does not fall within one of the statute's enumerated categories, courts will then determine whether the transaction falls within the definition of the general term "security" (id.) To do so, the Court of Appeals has directed courts in this state to consider "as persuasive authority the decisions of the United States Supreme Court and other Federal courts construing the Federal Blue Sky Laws" (see All Seasons Resorts, Inc. v Abrams, 68 NY2d 81, 87 [1986]). One such federal test that the Court of Appeals has endorsed for "determining whether a given interest is a security" is the one articulated by the U.S. Supreme Court in SEC v W.J. Howey Co. (328 US 293 [1946]) (All Seasons Resorts, 68 NY2d at 92).
Under Howey, an offering (such as an investment contract) is a security where there is (1) an investment of money, (2) in a common enterprise, and (3) an expectation of profits derived solely from the efforts of others (People v First Meridian Planning Corp., 86 NY2d 608, 618-619 [1995], quoting Howey, 328 U.S. at 299). This test "embodies a flexible rather than static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits" (SEC v Edwards, 540 U.S. 389, 393 [2004]; Reves v Ernst & Young, 494 US 56, 61 [1990]).
Mashinsky argues that NYAG fails to establish that EIAs are securities under the Martin Act (MOL at 6-7). Although Mashinsky does not seriously dispute that the allegations concerning EIAs in the Complaint satisfy the first prong of the Howey test, he contends that NYAG does not plausibly allege that Celsius's users invested money in a common enterprise or with the expectation of obtaining profits (id. 6-8; NYSCEF # 15 — Reply at 3-6). As explained, the court disagrees.
A. Common Enterprise
With regard to the "common enterprise" prong of the Howey test, Mashinsky argues that NYAG fails to allege "horizontal commonality," i.e., "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits" (MOL at 7, quoting U.S. Sec. & Exch. Comm'n v Kik Interactive, 492 F Supp 3d 169, 178 [SD NY 2020]). In response, NYAG argues that New York courts have endorsed a "broad vertical commonality" test that only requires the fortunes of investors to be linked to the efforts of a promoter or third party (NYSCEF # 14 — Opp at 5).
Most courts that have considered the "common enterprise" prong of the Howey test have found that it is satisfied "by a showing of so called 'horizontal commonality', i.e. 'the pooling of investment funds, shared profits, and shared losses'" (Mount Lucas Assocs., Inc. v MG Refining and Marketing, Inc., 250 AD2d 245, 252 [1st Dept 1998], quoting SEC v Life Partners, Inc., 87 F3d 536, 543 [DC Cir 1996]; Revak v SEC Realty Corp., 18 F3d 81, 88 [2d Cir 1994]; see also SEC v SG Ltd., 265 F3d 42, 49 [1st Cir 2001];Wals v Fox Hills Dev. Corp., 24 F3d 1016, 1018 [7th Cir 1994]). But "horizontal commonality" is not the only way to satisfy Howey's common enterprise prong. Indeed, federal courts have recognized that a common enterprise may also be established by a showing of vertical commonality (see Revak, 18 F3d at 87 [collecting cases]).
One type of vertical commonality recognized by federal courts is "strict" vertical commonality, which requires that "the fortunes of investors be tied to the fortunes of the promoter" (see Friel v Dapper Labs, Inc., — F Supp 3d —, 2023 WL 2162747, at *10 & n.10 [SD NY Feb. 22, 2023] [emphasis in original]; SEC v NAC Found., LLC, 512 F Supp 3d 988 [ND Cal 2021], citing Hocking v Dubois, 885 F2d 1449, 1459 [9th Cir 1989] ["a common enterprise exists where the investment scheme involves either 'horizontal commonality' or 'strict vertical commonality.'"]). Meanwhile, certain other federal courts have also permitted parties to establish a common enterprise through the less restrictive "broad vertical commonality" test, which only requires a showing that "the fortunate of investors are tied to the efforts of the promoter (Friel, 2023 WL 2162747 at *10 [emphasis added]; see e.g. Matter of Living Benefits Asset Mgmt., L.L.C., 916 F3d 528, 536 [5th Cir 2019] ["This circuit . . . applies so-called broad vertical commonality, under which a common enterprise exists when 'the fortuity of the investments collectively is essentially dependent upon promoter expertise.'"]; SEC v ETS Payphones, Inc., 408 F3d 727, 732 [11th Cir 2005] [endorsing "broad vertical commonality" test]).[FN6]
Notably, as is relevant here, the New York Court of Appeals has endorsed the "broad vertical commonality" test in its opinion in People v First Meridian Planning Corp. (86 NY2d at 618-21).
In First Meridian, defendants were charged with, among other crimes, fraud in the sale of securities related to a scheme to encourage investments into numismatic coin portfolios, art portfolios, and condominiums (id. at 614). Defendants subsequently moved to dismiss the indictment on various grounds, including that the sale of numismatic coins did not constitute a [*6]sale of securities, and their motion was granted (id. at 615). The Third Department reversed (People v First Meridian Planning Corp., 201 AD2d 145, 151-53 [3d Dept 1994]). In addressing the second prong of the Howey test, the court first surveyed the various theories of "commonality" that federal courts have recognized, including "horizontal commonality," "strict vertical commonality," and "broad vertical commonality" (id. at 152). The court then determined that, although the facts of the case did not support a finding of either "horizontal commonality" or "strict vertical commonality," the state had established a common enterprise under Howey by showing that "the fortunes of the investor [were] linked to the efforts of the promoter," i.e., "broad vertical commonality" (id. at 152-53). As the Third Department explained, it reached this conclusion because "application of the 'broad' vertical commonality approach [was] consistent with the liberal interpretation to be given to the Martin Act to give effect to its remedial purpose" (id.).
In affirming this decision, the Court of Appeals essentially adopted the "broad vertical commonality" test upon which Third Department relied (86 NY2d at 618-621). Specifically, echoing the Third Department, the Court reiterated that, under the second Howey prong, "[i]t is not required that the investor acquires a share in a common fund. Rather, the common enterprise factor can be established by proof that 'the fortunes of all investors are inextricably tied to the efficacy [of those seeking the investment or a third party]'" (id. at 620, quoting SEC v Koscot Interplanetary, 497 F2d 473, 479 [5th Cir 1974] [emphasis added]). Thus, following the First Meridian decision, New York courts may now analyze the existence of a "common enterprise" through evidence of "broad vertical commonality" (see Bank of New York Mellon, 40 Misc 3d 1232[A] at *11 n.14 [acknowledging that the Court of Appeals endorsed broad vertical commonality]; State v Justin, 3 Misc 3d 973, 990 [Sup Ct, Erie County, 2003] ["New York State courts . . . have adopted a less restrictive criterion of 'broadly vertical commonality'"]).
Here, the court concludes that NYAG pleaded a "common enterprise" under Howey by establishing "broad vertical commonality." As alleged, Celsius's investors could transfer cryptocurrency from their own digital wallets into EIAs (AC ¶¶ 21, 23). Celsius's investors deposited their assets with the understanding that they would earn returns at rates that were updated on a weekly basis based on (1) "weekly demand" for a particular cryptocurrency and, notably, (2) Celsius's "promise that up to 80% of [its] profits are returned to [] depositors" (id. ¶ 22). Therefore, any interest earned from the EIAs would be derived from Celsius's "work to generate returns"—the so-called "sleep to earn" model (id. ¶¶ 24, 44). Indeed, as NYAG alleges, Celsius pooled its investors' digital assets together and then, "acting in [investors'] best interest," used the pooled assets in various revenue-generating activities, including collateralized loans to institutions and retail investors (see id. ¶¶ 23. 32, 35, 44). These facts, accepted as true, plausibly establish that Celsius's investors' fortunes (namely, the returns expected from their EIAs) were "inextricably tied to the efficacy" of Celsius's efforts to generate profits through its investment activities (see SEC v Gordon, 2021 WL 5086556, at *4-5 [ND Tex Nov. 1, 2021, No. 3:21-CV-1642-B] [concluding that complaint established "broad vertical commonality" where investors would benefit from defendants' ability to generate profits based on its investment and refinancing activities in connection with rental properties]; SEC v ETS Payphones, Inc., 408 F3d 727, 732 [11th Cir 2005] [concluding that "common enterprise" existed where investors [*7]depended on defendant's ability to develop business to realize profits]).[FN7]

In arguing that NYAG fails to plead a "common enterprise," Mashinsky chiefly relies on the Sixth Circuit's unpublished decision in Cooper v King (114 F3d 1186 [Table] [6th Cir May 9, 1997]). To the extent that the central holding in Cooper was not abrogated by the U.S. Supreme Court's decision in SEC v Edwards (see 540 US at 396-97 [reversing 11th Circuit decision concluding that a payphone sale-and-leaseback arrangement was not a security under Howey]), Mashinsky's reliance on this case is ultimately unavailing. Notably, the Cooper court couched its analysis entirely on the basis of "horizontal commonality," not "vertical commonality" (Cooper, 114 F3d 1186 [Table] at *2). But courts that have since considered these types of investment transactions under the lens of "vertical commonality" have concluded that they do amount to a "common enterprise" under Howey (see ETS Payphones, Inc., 408 F3d at 732; see also Justin, 3 Misc 3d at 990-91 [concluding that "sale/leaseback transaction[]" constituted a "common enterprise" under Howey]). Thus, if, as Mashinsky suggests, EIAs are analogous to the transactions set forth in Cooper, the weight of authority confirms that they do involve a "common enterprise."
In short, NYAG sufficiently pleads a "common enterprise" under Howey.
B. Expectation of Profits
Turning to third Howey prong, Mashinsky argues that there was "no expectation [that Celsius investors] would share in Celsius's profits" because investors only received "a predetermined interest rate" (MOL at 8). NYAG counters that courts have rejected Mashinsky's position (Opp. at 7).
As noted above, under the third Howey prong, investors must have been "led to expect profits solely from the efforts of the promoter" (United States v Leonard, 529 F3d 83, 88 [2d Cir 2008], quoting Howey, 328 US at 299]). "An investor possesses an expectation of profit when their motivation to partake in the relevant 'contract, transaction or scheme' was 'the prospects of a return on their investment'" (SEC v Telegram Grp. Inc., 448 F Supp 3d 352, 371 [SD NY 2020], quoting Howey, 328 US at 301]. The term "profits" in turn refers to "the profits that investors seek on their investment, not the profits of the scheme in which they invest" (Edwards, 540 US at 394; see also Warfield v Alaniz, 569 F3d 1015, 1024 [9th Cir 2009] [concluding that [*8]an annuity amount paid at a "fixed rate" amounted to profit for purposes of establishing an expectation of profit within the meaning of Howey]; SEC v Infinity Grp. Co., 212 F3d 180, 189 [3d Cir 2000] ["the definition of security does not turn on whether the investor receives a variable or fixed rate of return"]).
When assessing whether expectations of profits were derived "solely from the efforts of the promoter," courts shall construe the term "solely" "realistically," not "literally" (First Meridian, 86 NY2d at 620; People v Sala, 258 AD2d 182, 194 [3d Dept 1999]). To that end, the Court of Appeals has instructed that the third prong the Howey test is met "if the promoter's (or third person's) efforts are 'the undeniably significant ones, those essential managerial efforts, which affect the failure or success of the enterprise'" (First Meridian, 86 NY2d at 620-621, quoting SEC v Turner Enters., 474 F2d 476, 482 [9th Cir 1973]).
Here, the court has little trouble concluding that the Complaint's allegations concerning EIAs satisfy the third prong of the Howey test. According to the Complaint, the primary draw of EIAs (as promoted by both Mashinsky and Celsius) were their yield rates (AC ¶ 22). Specifically, as noted above, Mashinsky highlighted in blog posts that investors would realize return rates that were calculated based on weekly demand on coins combined with Celsius's promise to share up to 80% of its profits with investors (id.). Mashinsky further represented in online interviews that upon depositing virtual currencies with Celsius, investors could expect that "every Monday [Celsius would] pay you yield" from its investment and lending activities (see id. ¶¶ 24, 32, 35, 37, 44). And a notable aspect of EIAs, as also promoted by Mashinsky, was that it had a "sleep to earn" model, meaning that investors did not have to take any action to derive a return from their deposit of cryptocurrencies (id. ¶ 24). The totality of these allegations, accepted as true, support a conclusion that a reasonable investor depositing digital assets with EIAs would have expected to obtain profits solely from the efforts of Celsius's investment activities (see SEC v Terraform Labs Pte. Ltd., — F Supp 3d —, 2023 WL 4858299, at *14-15 [SD NY July 31, 2023] [concluding that third prong of Howey sufficiently alleged where "defendants' embarked on a public campaign to encourage both retail and institutional investors to buy their crypto-assets by touting the profitability of the crypto-assets and the managerial and technical skills that would allow the defendants to maximize returns on the investors' coins"]; SEC v NAC Found., LLC, 512 F Supp 3d 988, 996-997 [ND Cal 2021] [concluding that third prong of Howey sufficiently alleged where investors expected to derive a profit from defendants' efforts to encourage widespread adoption of a new and novel cryptocurrency]).
To avoid this conclusion, Mashinsky argues that, because Celsius's investors received "a predetermined interest rate," they had "no expectation they would share Celsius's profits" (MOL at 8). As a preliminary matter, this contention is plainly belied by the allegations of the Complaint, which allege, and also support a reasonable inference, that the EIA model was built around the idea that depositors would obtain returns that were, at least in part, premised on Celsius's profits and thus its efforts to obtain those profits (see AC ¶¶ 22, 24, 32).[FN8]
At any rate, [*9]insofar as Mashinsky insinuates that any "predetermined interest rate" associated with EIAs undercuts investors' expectancy of profits for purpose of the third Howey prong, his contention has been firmly rejected by federal courts [FN9]
(see Edwards, 540 US at 396-397 [holding that "an investment scheme promising a fixed rate of return can be an 'investment contract' and thus a 'security' subject to the federal securities laws"]; Infinity Grp. Co., 212 F3d at 189 [observing the same]).
In sum, NYAG sufficiently alleged that the EIAs satisfy the third prong of the Howey Test. NYAG has therefore pleaded that Celsius's EIAs are securities for purposes of the Martin Act.
II. Does the Complaint Sufficiently Alleges Claims "Related To" or "In Connection With" Securities or Commodities?
Mashinsky maintains that the Complaint fails to allege (1) the existence of any securities or commodities, (2) that any of the alleged misstatements relate to the "issuance, exchange, sale, promotion, negotiation, advertisement, investment advice or distribution" of securities or commodities, or (3) that the alleged misstatements induced Celsius investors to buy or sell securities (see MOL at 9-11).
As a preliminary matter, Mashinsky's contention that EIAs are not securities fails for the reasons already articulated in this decision (see supra, Discussion § I). With regard to commodities, NYAG avers that CEL tokens, which are, as alleged, "Celsius's proprietary [cryptocurrency] token, held on Celsius's books," constitute commodities (AC ¶¶ 6, 103). The court agrees. Under the Martin Act commodities are defined as "any commodity dealt in on any exchange within the United States of America or the delivery of which is contemplated by transfer of negotiable documents of title" (GBL § 352 [1]), as well as "any foreign currency, and any other good, article, or material" (id. § 359-e [14]). Courts, in turn, have acknowledged that cryptocurrencies are a type of commodity under the definitions set forth the Martin Act and the Commodities Exchange Act, respectively (see James v iFinex Inc., 185 AD3d 22 [1st Dept 2020]; CFTC v McDonnell, 287 F Supp 3d 213, 228 [ED NY 2018]). Accordingly, the court concludes that the Complaint also contains allegations concerning commodities.
Similarly falling flat is Mashinsky's contention that none of his alleged misstatements " [*10]'relate to' or 'were engaged in to induce or promote' the issuance, exchange, purchase, sale or other action of a security or commodity" (MOL at 10). To reiterate, the Martin Act prohibits fraudulent or misleading practices and representations by any person or entity who is "engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities" (GBL § 352-c [1]). Such conduct is prohibited "regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted" (id.). Here, the facts alleged in the Complaint place Mashinsky's conduct squarely within the ambit of these proscriptions. For instance, the Complaint contains sufficient details regarding Mashinsky's alleged misstatements and their purported targeting of new and existing Celsius investors (see AC ¶¶ 26, 29-30, 34-35, 41-42, 46, 58, 81, 84-88). And those facts, if accepted as true, support a reasonable inference that Mashinsky's alleged misrepresentations induced or promoted investors to deposit assets into Celsius's EIAs, to keep their assets with Celsius as part of the "Earn" program, and/or to invest into Celsius's CEL Token (see id. ¶¶ 22, 24-25, 32, 34-35, 39, 65-69, 81-100, 106-111). All told, the Complaint plausibly alleges fraudulent or misleading practices by Mashinsky (through his promotion and marketing efforts) that are "related to" the issuance, distribution, exchange, sale, negotiation or purchase" of any securities or commodities.
The above notwithstanding, Mashinsky points to Chadbourne & Parke LLP v Troice, 571 US 377 [2014]—a case that, among other issues, interpreted the "in connection with" language contained in Section 10(b) of the Securities Exchange Act—to aver that the fraudulent conduct under the Martin Act must lead to the buying and selling of securities (id.).[FN10]
This contention fails for multiple reasons.
First, as explained above, there are sufficient allegations alleged to support a plausible inference that Mashinsky's alleged misstatements induced or promoted new investors to deposit assets in Celsius's EIAs. Second, as noted by NYAG, the Martin Act does not require investors to take any specific action so long as a defendant has engaged in fraudulent conduct when "engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase" of any securities or commodities (GBL § 352-c [1]; see State v Sonifer Realty Corp., 212 AD2d 366, 367 [1st Dept 1995] ["A false representation may be illegal 'regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted'"]). Finally, even if the Troice court's interpretation of the "in connection with" language in the Exchange Act had any bearing on how to interpret the Martin Act, courts applying Troice have held that the alleged securities fraud "must be of the type that is material to someone other than the fraudster to buy, sell, or hold a covered security" (see Zweiman v AXA Equitable Life Ins. Co., 146 F Supp 3d 536, 550 [SD NY 2015]), and this can include "inducement to action or forbearance" (O'Donnell v AXA Equitable Life Ins. Co. , 887 F3d 124 [2d Cir 2018]). Thus, even after applying these standards to the case at bar, the court would still conclude that the Complaint sufficiently alleges [*11]misstatements and omissions that were "in connection with" investment decisions by both Celsius's current and prospective investors (see id. ¶¶ 22, 24-25, 32, 34-35, 39, 65-69, 81-100, 106-11).
At bottom, NYAG sufficiently pleads allegations "related to" securities and commodities under the Martin Act.
III. Does the Complaint Sufficiently Allege Fraud and Damages under the Martin Act?
Mashinsky essentially advances three challenges to the alleged misrepresentations and omissions in the Complaint. First, Mashinsky maintains that NYAG failed to plead fraud with particularity, and, in any event, none of the representations alleged by NYAG were material to investors (MOL at 11-14, 16-19). Second, he contends that certain alleged misrepresentations are non-actionable fraud by hindsight (id. at 14-15). Finally, he avers that the Complaint fails to allege damages (id. at 16). The court addresses each of these contentions in turn.
A. Particularity of Allegations and Materiality of Misstatements
It is well established that the Martin Act "should be liberally construed to give effect to its remedial purpose of protecting the public from fraudulent exploitation in the offer and sale of securities" (People ex rel. Schneiderman v Barclays Cap., Inc., 47 Misc 3d 862, 868 [Sup Ct, NY County, 2015] [internal quotations omitted]). For this reason, the terms "fraud" and "fraudulent practices" are given broad meaning and will encompass "all deceitful practices, even acts 'not originating in any actual evil design to perpetrate fraud or injury upon others, which do tend to deceive or mislead the purchasing public" (People v Lexington Sixty-First Assocs., 38 NY2d 588, 595 [1976], citing People v Federated Radio Corp., 244 NY 33, 38-39 [1926]).
To sufficiently plead Martin Act fraud, NYAG must allege that the purported fraud or fraudulent practice involved misrepresentations and/or omissions or concealments of material facts (see Barclays, 47 Misc 3d at 869; see also Greenberg, 95 AD3d at 483 [explaining that "an essential element of the Attorney General's Martin Act claims is that the alleged fraudulent transactions be material, i.e., that they have more than a trivial effect on net income or shareholder equity"]). NYAG, however, is not required to plead "scienter or intent to defraud" (see Greenberg, 95 AD3d at 483). Nor must NYAG plead reliance on the part of any investor to obtain relief (see People by Schneiderman v Credit Suisse Secs. (USA) LLC, 31 NY3d 622, 632 [2018], citing Sonifer Realty Corp., 212 AD2d at 367). Even so, pursuant to CPLR 3016(b), NYAG must plead the pertinent elements of a Martin Act fraud claim with particularity (see People v Katz, 84 AD2d 381, 385 [1st Dept 1982]; Barclays, 47 Misc 3d at 869 n.7; see also People ex rel. Cuomo v Charles Schwab & Co., Inc., 33 Misc 3d 1221[A], at *5 [Sup Ct, NY County, Oct. 24, 2011] [noting that CPLR 3016(b) applies "with equal force" to NYAG]. This requires "facts sufficient to permit a reasonable inference of the alleged conduct" (Charles Schwab, 33 Misc 3d 1221[A] at *3, *5 quoting Pludeman v Northern Leasing Sys., Inc., 10 NY3d 486, 492 [2008]).
With regard to materiality under the Martin Act, New York courts have adopted the objective standard articulated by federal courts construing federal securities law (see State v Rachmani Corp., 71 NY2d 718, 726-727 [1988]). The test for materiality is whether defendant's representations or omissions, "taken together and in context, would have [misled] a reasonable investor about the nature of the investment" (Bank of New York Mellon, 40 Misc 3d 1232[A] at *11). In other words, "there must be a substantial likelihood that the [misrepresentation or] disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" (TSC Indus., Inc. v Northway, [*12]Inc., 426 US 438, 449 [1976]; accord Rachmani, 71 NY2d at 727). As part of this assessment, courts will presume that a reasonable investor has "knowledge of information that has already been disclosed or is readily available (Rachmani, 71 NY2d at 727).
At the outset, NYAG has alleged Martin Act fraud with particularity. The Complaint provides a thorough recitation of purported misstatements made by Mashinsky, including the date such misstatements were made, the context of those statements, and the general audience of those statements (see e.g. AC ¶¶ 35-38, 47, 50-51, 81-85). The Complaint further provides context demonstrating how those misstatements and omissions were purportedly false. Put succinctly, the Complaint's allegations plainly set forth facts that are "sufficient to permit a reasonable inference of alleged fraud" (Charles Schwab, 33 Misc 3d 1221[A] at *5, quoting Pludeman, 10 NY3d at 492).
In challenging the issue of materiality, Mashinsky points to four categories of alleged misstatements: (1) Mashinsky's comparison of Celsius to banks and broker-dealers, (2) Mashinsky's representations concerning the size of Celsius's user base, (3) Mashinsky's statements concerning Celsius's alleged compliance with state regulators, and (4) Mashinsky's representations about Celsius's investment strategies (MOL at 12-14). In essence, Mashinsky avers that these statements are immaterial because they are nonactionable puffery, insufficiently vague or speculative, and/or mere generalizations (id.). The court disagrees. NYAG's allegations concerning Mashinsky's purported misrepresentations and omissions, if accepted as true for purposes of this motion, support a conclusion that a reasonable investor would have viewed them as material to an investment decision. This is the case whether analyzing the alleged misrepresentations collectively or as discussed below, if considering each category of representations on its own.
To start, NYAG sufficiently alleges that the statements concerning the safety of Celsius's deposits are material. As pleaded, Mashinsky repeatedly represented that investors' assets would be safe as if deposited "with the bank," and that Celsius would "act in [these investors'] best interest (AC ¶¶ 35-36). He further averred that Celsius's "only difference" to institutional broker-dealers was that "Celsius gives 80% of [its profit] to the depositor, to the user," and that Celsius would "take full responsibility for safeguarding investor assets" (id. ¶¶ 37, 39). These purported statements did not merely, as Mashinsky suggest, offer opinions about the safety of Celsius's deposits that could not be proven false. To the contrary, even if investors did know about the unregulated nature of Celsius's operations, Mashinsky's statements essentially cast Celsius as an entity that was on equal footing with institutional banks and broker-dealers in terms of the rigors of its protection of assets and the likelihood that investors could be made whole in times of crisis. As a result, the Complaint supports a reasonable inference that Mashinsky's statements altered the total mix of information available to investors about the safety of investing with Celsius (see Woods v Maytag Co., 807 F Supp 2d 112, 123 [ED NY 2011] [concluding that false statement regarding the safety of a product made in response to customer question, which in turn induced the product's purchase, did not constitute mere "puffery"). None of the cases cited by Mashinsky support a different conclusion (Bader v Siegel, 238 AD2d 272, 272 [1st Dept 1997] [defendant's statements concerning a "promise" to "demonstrate the 'strategies, tactics and formulations'" during self-improvement classes did not amount to anything more than an opinion]; Paladino v Adelphi Univ., 89 AD2d 85, 87 [2d Dept 1982] [no fraudulent misrepresentation where alleged statements only concerned the "quality or comparative quality" of education that students would receive]).
Mashinsky's contention that his statements about Celsius's investors base and its regulatory compliance are insufficiently vague or "not 'sufficiently specific'" is likewise devoid of merit. Regarding Celsius's user base, the crux of NYAG's fraud allegations is that Mashinsky represented (or at least insinuated) that "'two million people' had earned yield," even though many of Celsius's users had not yet transferred assets and earned yields (AC ¶¶ 40-43). When properly contextualized, these alleged statements did not, as Mashinsky suggests, amount to "speculative assumptions" about some future occurrence that may impact Celsius. Rather, they addressed Celsius's current state of user engagement and success using EIAs, which could have certainly impacted the investment decisions of current and prospective investors to deposit assets (cf. People v Exxon Mobil Corp., 65 Misc 3d 1233[A], at *20 [Sup Ct, NY County, 2019] [concluding that alleged misstatements made in 2014 concerning greenhouse gas costs that may potentially be incurred by 2030 and 2040 were too speculative to be considered material to a reasonable investor]). As for Mashinsky's alleged statements concerning regulatory compliance (AC ¶¶ 112-15), the Complaint provides sufficient details of alleged misstatements concerning regulatory approval and compliance that supports a reasonable inference of materiality to survive a motion to dismiss.
The final category of alleged misrepresentations on which Mashinsky focuses are those concerning Celsius's deployment strategies. Contrary to Mashinsky's position, these statements are not "mere 'generalizations'" about Celsius (MOL at 13-14). Instead, according to the Complaint, Mashinsky repeatedly assured investors that Celsius was engaged in investment strategies that seemingly minimized any risk to the company and its investors (see AC ¶¶ 45, 47, 50, 54-55, 58, 61, 74, 76, 78). This included representations that Celsius (1) would pay yields without taking risk and would avoid deploying assets into risky areas (such as DeFi), (2) only made loans that were collateralized and to reputable counterparties, and (3) avoided taking large positions in Terra and the Anchor Protocol (id. ¶¶ 45, 47, 54, 58, 61, 70-72, 74). As alleged, many of Mashinsky's representations proved to be contrary to Celsius's actual practices at the time his statements were made (see id. ¶¶ 44-79). Nor were the consequences of Celsius's actual deployment strategies, including its financial exposure arising from its investment strategies, apparent or otherwise discernable from Mashinsky's representations (id.). Altogether, the misrepresentations concerning Celsius's deployment strategies detailed in the Complaint, when considered collectively and with context, would have, as alleged, altered the total mix of information available made available to investors (see McMahan & Co. v Wherehouse Entertainment, Inc., 900 F2d 576, 579 [2d Cir 1990] [explaining, for determining materiality, that the "central issue" is "whether defendants' representations, taken together and in context, would have mislead a reasonable investor"]).
In short, accepting the allegations in the Complaint as true and drawing all reasonable inferences in NYAG's favor, the court concludes that NYAG has sufficiently pleaded material misrepresentations and omissions and has done so with particularity. Mashinsky's motion, at most, raises issues of fact concerning materiality. But this only underscores why dismissal is inappropriate at this time (see People ex rel. Cuomo v Merkin, 26 Misc 3d 1237[A] at *4 [Sup Ct, NY County, Feb. 8, 2010] ["Materiality is a mixed question of fact and law. Therefore, it is inappropriate for resolution at the motion to dismiss stage"]).
B. Nature of Certain of Mashinsky's Alleged Misstatements
In addition to the above contentions, Mashinsky further avers that certain of his alleged misstatements constitute non-actionable fraud in hindsight (MOL at 14-15). It is true that courts [*13]will not permit allegations of fraud by hindsight to support a claim for fraud (see Novak v Kasaks, 216 F3d 300, 309 [2d Cir 2000]). In other words, NYAG must allege in the Complaint alleged misrepresentations were "false when made" (Zutty v Rey Select Broad Market Prime Fund, L.P., 33 Misc 3d 1226[A], at *10 [Sup Ct, NY County, Apr. 15, 2011]). NYAG has done so here.
According to the Complaint, Celsius was experiencing a liquidity crisis following the Crash (see AC ¶¶ 84-85, 97). Specifically, by at least May 13, 2022, Celsius's total liabilities exceeded its assets, and this continued to be the case going into June 2022 (id. ¶¶ 84, 97, 105). Moreover, between May 9, 2022, and May 24, 2022, customer withdrawals caused Celsius to experience a net loss of over $1.4 billion in assets, all while the company was experiencing losses as a result of its deployment of investors' assets (id. ¶¶ 85, 102). Despite Celsius's financial conditions at the time, Mashinsky repeatedly assured investors that their "assets are there when [they] need them," Celsius was "ready with the liquidity," and the company was not exposed to any of the "huge damage" caused by the Crash (id. ¶¶ 82-84, 89-91, 93). Mashinsky went so far as to claim in the days immediately preceding Celsius's freezing of withdrawals that "Celsius has billions in liquidity," which was in stark contrast to Celsius's actual financial condition at the time (id. ¶¶ 98, 102, 104). The allegations in the Complaint, do not, as Mashinsky claims, paint a picture of an individual who merely failed to anticipate mass withdrawals (MOL at 15). Instead, the allegations, accepted as true, depict an individual actively misrepresenting the financial condition of his company to keep it afloat. NYAG sufficiently alleges statements that fraudulent at the time they were made, rather than fraud by hindsight.[FN11]

C. Basis for NYAG's Claims for Damages against Mashinsky
Finally, Mashinsky avers that NYAG cannot seek money damages or restitution because the Complaint fails to allege an injury to any New York resident, or any unfair gains to Mashinsky (MOL at 16; Reply at 8-9). NYAG responds that Mashinsky would be liable under the Martin Act for damages to all EIA investors based on his fraudulent conduct made within or from New York (Opp. at 17).
It is well established that NYAG has authority to recover on behalf of non-New York residents (see People ex rel. Cuomo v H & R Block, Inc., 58 AD3d 415, 417 [1st Dept 2009];Charles Schwab, 33 Misc 3d 1221[A] at *6). Indeed, "so long as there is a nexus between a securities transaction and New York, the Martin Act applies" (Charles Schwab, 33 Misc 3d 1221[A] at * 6). Here, with respect to the nature of the injury, the Complaint alleges that many Celsius investors were impacted by the eventual bankruptcy of the platform, and it further alleges that these victims would have included New York residents as well (see AC ¶¶ 8-9, 25). The Complaint further supports a reasonable inference that the harm suffered by investors flowed, at least in part, from Mashinsky's alleged misrepresentations made in New York [*14]concerning Celsius's overall financial health and investment safety (see id. ¶¶ 9, 26, 80-105, 132-38). Accordingly, this basis for dismissal is denied.
Mashinsky otherwise avers that NYAG "ignore[s] undisputable principles of law requiring supporting allegations for monetary damages claims" (Reply at 8). But as NYAG avers, although restitution and damages are available under the Martin Act, "[p]roof of actual damages, injury or reliance [is] not a required element for liability to accrue" (see People v Greenberg, 2010 WL 4732745, at *34-35 [Sup Ct, NY County, Oct. 21, 2010], affd 95 AD3d 474 [1st Dept 2012] [denying motion for summary judgment dismissing complaint on basis that NYAG was unable to establish any damages or reliance]). To be sure, while Martin Act liability does not hinge on proof of damages, NYAG will need to establish damages to obtain the relief identified in the Complaint (see generally State v McLeod, 12 Misc 3d 1157[A], at *20 [Sup Ct, NY County, Feb. 9, 2006] [concluding that "hearing [was] necessary on the amount of restitution" that defendant must pay in connection with Martin Act claim]). Nonetheless, the fact that NYAG has not made a specific showing of damages in its Complaint does not preclude its ability to pursue the monetary remedies it otherwise identifies as part of its allegations and causes of action (see McLeod, 12 Misc 3d 1157[A] at *20 [rejecting argument that state was unable to seek money damages because "they were not specified in the complaint"]).[FN12]

Stated succinctly, the court declines to dismiss NYAG's Martin Act claims to the extent they seek monetary damages.
In conclusion, as the foregoing makes clear, NYAG has sufficiently stated a claim for securities fraud and damages under the Martin Act. Mashinsky's motion to dismiss NYAG's Martin Act fraud claims is denied.
IV. Does the Complaint Sufficiently Allege a Failure to Register Claim under the Martin Act?
NYAG alleges several causes of action concerning Mashinsky's purported failure to register as a dealer or salesperson of securities and/or commodities, as required under the Martin Act (AC ¶¶ 139-40, 149-50). Mashinsky argues that, in addition to failing to adequately allege a security under the Martin Act that is subject to Section 359-e, NYAG has failed to allege that Mashinsky acted as a dealer or salesperson of a security or commodity (MOL at 19). Specifically, Mashinsky avers that the Complaint does not allege that Mashinsky sold any of the EIAs for his "own account," engaged with investors to open or transfer yields to EIAs or acted as a salesperson for Celsius (id. at 20; Reply at 9). Mashinsky also avers that NYAG fails to identify any commodity that Mashinsky promoted or sold as a purported dealer or otherwise establish how he acted as a commodities dealer or salesperson (MOL at 20-21).
Section 359-e of the Martin Act requires certain persons and entities, such as dealers and [*15]salespersons, to register before transacting in the business of securities or commodities in New York (see GBL § 359-e). The Martin Act defines a "dealer" as "any person, firm, association or corporation" that "buy[s] or sell[s] securities from or to the public within or from this state for his or its own account, through a broker or otherwise" (id. § 359-e [1] [a]). Similarly, the Act defines a salesperson as "every person employed by a broker or dealer" as defined by Section 359-e (id. § 359-e [1] [c]). Failure to comply with Section 359-e is "deemed a violation of and a fraudulent practice within the meaning of" the Martin Act (id. § 359-e [12]).
Here, accepting the allegations in the Complaint as true, the court concludes that NYAG has stated a claim under Section 359-e of the Martin Act. As a preliminary matter, for the reasons previously explained in connection with NYAG's Martin Act fraud claims, the Complaint sufficiently alleges that EIAs are securities and that CEL tokens are commodities (see supra, Discussion §§ I & II). The Complaint otherwise alleges sufficient facts to support a conclusion that that Celsius was a dealer of securities and/or commodities for purposes of the Martin Act (see AC ¶¶ 20-22, 24-25, 29, 107-109, 121). Finally, the Complaint sets forth sufficient allegations that, if accepted as true, indicate that Mashinsky operated as a salesperson of securities and commodities, particularly given his promotion of Celsius's EIAs and CEL tokens (see id. ¶¶ 24, 26, 29, 34-35, 41, 44, 86-88, 107-111).
To be clear, the burden will remain on NYAG to actually prove that Mashinsky is a salesperson and/or dealer under the Martin Act for purposes of his alleged failure to register. And whether NYAG will be able to do so has yet to be determined. However, accepting the Complaint's allegations as true and after drawing all reasonable inferences in NYAG's favor, the court cannot conclude at the motion to dismiss stage that that the facts alleged do not fit with any cognizable legal theory under Section 359-e (CPLR 3211 [a] [7]). Mashinsky's motion to dismiss NYAG's Martin Act failure-to-register claim is denied.
V. Does the Complaint Sufficiently Allege Executive Law § 63(12) Claims?
Mashinsky argues that NYAG's Executive Law claims should be dismissed for the same reasons supporting dismissal of NYAG's Martin Act claims (MOL at 23). As this argument acknowledges, NYAG's Executive Law § 63(12) claims are premised on the same conduct underlying the Martin Act claims. These claims therefore stand and fall together (see People v Greenberg, 95 AD3d 474, 482-483 [1st Dept 2012]; accord People by Schneiderman v Trump Entrepreneur Initiative LLC, 137 AD3d 409, 417-418 [1st Dept 2016] ["the language of § 63(12) parallels the language of the Martin Act"]). Hence, for the same reasons articulated in this court's analysis of NYAG's Martin Act claims, Mashinsky's motion to dismiss the Executive Law § 63(12) claims (Counts IV-VII) is denied in its entirety.
VI. Is Celsius a Necessary Party?
Mashinsky's final basis for dismissal is that the Complaint fails to name Celsius as a necessary party (MOL at 21-23; Reply at 10-12). On this point Mashinsky states the Complaint has several categories of allegations that are "inextricably tied to Celsius" and thus, by failing to include Celsius as a party, NYAG has "deprived [it] of its right to be heard concerning critical aspects of its business" (MOL at 22).
A plaintiff generally has the right to decide the persons or entities it joins as parties to its action (Serov ex rel. Serova v Kerzner Intern. Resorts, Inc., 52 Misc 3d 1214[A], at *9 [Sup Ct, NY County, July 26, 2016]). Nevertheless, certain parties are deemed necessary under CPLR 1001(a), namely persons or entities (1) "who ought to be parties if complete relief is to be accorded between the persons who are parties to the action," or (2) "who might be inequitably [*16]affected by a judgment in the action" (27th St. Block Ass'n v Dorm. Auth. of State of New York, 302 AD2d 155, 160 [1st Dept 2002] [internal quotations omitted]). The purpose of CPLR 1001(a) is "not merely to provide a procedural convenience but to implement a requisite of due process—the opportunity to be heard before one's rights or interests are adversely affected" (Martin v Ronan, 47 NY2d 486, 490 [1979]).
In assessing the issue of complete relief, courts will consider whether the relief sought against a defendant relies on, in part or in whole, an adjudication of the liability of and/or harm caused by the nonparty sought to be joined (see Almah LLC v AIG Employee Servs, Inc., 159 AD3d 532, 532 [1st Dept 2018] [holding that complete relief could be accorded "between plaintiff and [defendant], without joining [nonparty]" because "[defendant's] liability, if any, will be limited to any damage that it caused during its tenancy; it will not be liable for damage that [nonparty] may have caused during its earlier tenancy"]; Interstate Fire & Cas. v Aspen Ins UK Ltd., 2019 WL 5547026, at *3 [Sup Ct, NY County, Oct. 28, 2019] [explaining that complete relief could be accorded where "[p]laintiff determined that [insurers'] policies would not cover [] liability in the Underlying Action, whereas plaintiff concluded that [defendant] was the insurer during the relevant time period]). And with regard to whether a non-party would be "inequitably affected by a judgment," courts have held that the "possibility that a judgment rendered without [the omitted party] could have an adverse practical effect [on that omitted party] is enough to indicate joinder" (27th St. Block, 302 AD2d at 160, quoting Hitchock v Boyack, 256 Ad2d 842, 844 [3d Dept 1998]).
Here, Mashinsky fails to establish, at this juncture, that the court would be unable to accord complete relief between the parties without Celsius being named as a party, or that Celsius would be inequitably affected by a judgment in this action. Regarding the complete relief factor, NYAG has chosen to institute an action solely against Mashinsky stemming from his alleged misconduct and, in doing so, NYAG has necessarily cabined the requested relief to target only Mashinsky (AC ¶ 11 and Prayer for Relief).[FN13]
 Thus, whether Celsius is liable for any harm (if at all) has no bearing on the relief NYAG would be able to obtain (see Almah LLC, 159 AD3d at 532; see also Signature Bank v Faibish, 142 AD3d 1069, 1070 [2d Dept 2016] [concluding that nonparty corporations in bankruptcy were not necessary parties, even where plaintiff alleged that defendants used conglomerate of entities and several banking institutions to induce plaintiff to enter into a loan with the nonparty corporations who, in turn, defaulted on the loan]).
Mashinsky's position that Celsius would be inequitably affected by a judgment in this action is similarly unavailing. It is true that issues concerning Celsius's deployment and operational activities, as well as what happened at Celsius before and after the Crash, would be addressed in determining Mashinsky's liability. But courts are regularly able to adjudicate such interconnected factual and legal issues without requiring that all relevant parties be named to the action (as reflected in the somewhat analogous context of joint and several tortfeasor liability) (see e.g. Serov, 52 Misc 3d 1214[A] at *9, [explaining that "joint and several tortfeasors are permissive, not indispensable parties whose rights will be "inequitably affected" by entry of judgment:]; see generally Vincent C. Alexander, Practice Commentaries C1001:1 [noting that [*17]joinder typically not required in the context of joint and several tortfeasors "because a plaintiff's judgment against one of several tortfeasors cannot be undone by other suits, the defendant does not face double liability, and the other tortfeasors will not be inequitably affected"]).
Regarding the contention that several categories of NYAG's allegations are "inextricably tied to Celsius," the only issue identified by Mashinsky that could potentially have an adverse impact on Celsius is whether Celsius qualifies as a broker-dealer for purposes of a determining whether Mashinsky (not Celsius) violated Section 359-e of the Martin Act. But on this point, Mashinsky does not explain beyond speculation how, if at all, Celsius will be bound (either legally or practically) by any findings in this case in a future proceeding, particularly given both parties' apparent acknowledgment that neither collateral estoppel nor issue preclusion would be at issue (see generally Strough v Incorporated Vill. of West Hampton Dunes, 78 AD3d 1037, 1039-1040 [2d Dept 2010] ["In order to invoke [collateral estoppel], two requirements must be met: (1) the identical issue must have been necessarily decided in the prior action and must be decisive in the present action, and (2) the party who is precluded from relitigating the issue must have had a full and fair opportunity to contest the matter in the prior action"]). Simply put, there is no indication on the current record of even a "mere possibility" that a judgment in this action would adversely impact Celsius.
None of the cases cited by Mashinsky support a contrary conclusion. In City of New York v Long Island Airports Limousine Serv. Corp., for example, the Court of Appeals concluded that plaintiff failed to join the New York State Commissioner of Transportation as a necessary party because the issues raised in the case essentially challenged the Commissioner's power to regulate transportation into large metropolitan areas (48 NY2d 469, 475-76 [1979]). Likewise, in Fatone v Board of Elections of County of Rensselaer, the court concluded that two candidates for elected office were necessary parties to a proceeding initiated pursuant to Election Law §16-102 because, although petitioner was only challenging the designation of one candidate on a designating petition for an upcoming election, she claimed that the petition was, in general, "permeated with fraud" (218 AD2d 913, 913-14 [3d Dept 1995]). As the court recognized, these allegations, if sustained, would have "invalidated" the entire designating petition naming candidates for office and, in turn, impacted all candidates listed therein (including the nonparty candidates) (id.).[FN14]
Contrary to Mashinsky's assertion, these cases do not present "analogous situations" to the case at hand (MOL at 22). Rather, in both cases, unlike here, the legal determinations that would have been rendered by the court would necessarily implicate the legal rights or powers of a nonparty.
Even if, however, the court did conclude that Celsius were a necessary party, it would still not dismiss this action. As both parties observe, because Celsius is subject to an automatic [*18]stay in its bankruptcy proceedings, it cannot be joined in this action (see D.E. Shaw Composite Holdings, L.L.C. v Terraform Power, LLC, 2018 WL 731802, at *4 [Sup Ct, NY County, Feb. 6, 2018]). CPLR 1001(b) provides that, in such circumstances, courts may "allow the action to proceed in such nonparty's absence" after considering the following five factors: "(1) whether plaintiff has another remedy if the action is dismissed for nonjoinder; (2) the prejudice which may accrue from nonjoinder to the defendant or to the nonjoined party; (3) whether and by whom prejudice might have been avoided or may in the future be avoided; (4) the feasibility of a protective provision; and (5) whether an effective judgment may be rendered in the absence of the nonjoined person" (L-3 Comm'cns Corp. v SafeNet, Inc., 45 AD3d 1, 10-11 [1st Dept 2007]). When weighing these factors, courts "should be guided by the principle that dismissal for failure to join a necessary party should eventuate only as a 'last resort'" (id. at 11, citing Saratoga Cty Chamber of Commerce, Inc v Pataki, 100 NY2d 801, 821 [2003]).
Each of these five factors weigh in favor of allowing NYAG's case to proceed. As to the first factor, by virtue of the automatic stay in bankruptcy, dismissal of this action would effectively and indefinitely preclude NYAG from exercising her "broad regulatory and remedial powers to prevent fraudulent securities practices" under the Martin Act (see generally Assured Guar. (UK) Ltd v J.P. Morgan Inv. Mgmt. Inc., 18 NY3d 341, 350 [2011]).
Turning to the second and third factors, the prejudice to either Mashinsky or Celsius is minimal. To start, the relief granted in these proceedings will be premised solely on a determination of Mashinsky's liability (if any) and will not depend on Celsius's liability (if any). Furthermore, as explained above, any rulings from these proceedings will be nonbinding on Celsius, and Mashinsky otherwise fails to articulate any non-speculative prejudice to Celsius's rights if it were not joined. For its part, although it is currently subject to an automatic stay, Celsius could also take steps to avoid any possibility of prejudice by seeking authorization to intervene in this action (see 27th St. Block, 302 AD2d at 163 [explaining that, although petitioner was aware of non-party's role and bears the responsibility of any prejudice that might result by not joining that party, that nonparty was also "obviously aware of the proceeding, could have avoided any prejudice by seeking intervention, although not required to do so"]; L-3 Comm'cns, 45 AD3d at 13 ["Courts have routinely recognized that the ability of a nonjoined party to intervene in an action to avoid prejudice is a compelling factor in determining whether to dismiss a case for failure to join a necessary party"]).
Regarding the fourth factor, although neither party addresses whether there are feasible protections that the court could implement to protect Celsius's interests, the court is nevertheless confident that it will be able to craft orders and judgments to protect against any potential prejudice to a nonparty. Finally, in weighing the fifth factor, the court reiterates that it will be able to accord complete relief amongst the parties even in Celsius's absence from these proceedings.
In summary, there is no basis to view Celsius as a necessary party under CPLR 1001(a). But even if it were, the circumstances of this case do not warrant dismissal. Mashinsky's motion to dismiss pursuant to CPLR 3211(a)(10) is denied.

 Conclusion
For the foregoing reasons, it is
ORDERED that defendant's motion to dismiss is denied; and it is further
ORDERED that within 30 days of the e-filing of this order, defendant shall file an answer to the complaint (NYSCEF # 7); and it is further
ORDERED that a preliminary conference shall be held via Microsoft Teams on September 27, 2023, at 10:30 a.m. or at such other time that the parties shall set with the court's law clerk.
This constitutes the Decision and Order of the court.
Dated: August 4, 2023
Margaret A. Chan, J.S.C.

Footnotes

Footnote 1:The following facts are drawn from the Complaint and are assumed true for purposes of this motion.

Footnote 2:Celsius allegedly advertised return rates as high as 17% per year on deposits (AC ¶ 22).

Footnote 3:The term DeFi refers to financial services that operate on a blockchain, pursuant to certain predetermined rules, without the involvement of an institutional intermediary such as a bank or broker (AC ¶ 53).

Footnote 4:Celsius also purportedly loaned a billion dollars to Alameda Research Ltd. (Alameda), who Mashinsky viewed as a risky counterparty (AC ¶¶ 70-72). By November 2022, Alameda filed for bankruptcy (id. ¶ 73).

Footnote 5:Terraform Labs created the Anchor Protocol, a DeFi protocol promising 20% yields on deposits (id. ¶ 75). Celsius allegedly deposited investor assets on the Anchor Protocol despite Mashinsky acknowledging its risk (id. ¶¶ 75, 78).

Footnote 6:At the federal level, there is a circuit split over the viability of using "broad vertical commonality" to establish a "common enterprise" (see Matter of Living Benefits, 916 F3d at 536 [noting that "the meaning of 'common enterprise' in Howey's second prong" is "controversial" among circuits]; Friel, 2023 WL 2162747 at *10 ["[a]lthough other Circuits accept broad vertical commonality as a viable theory, in Revak, the Second Circuit explicitly rejected its application"]).

Footnote 7:As NYAG notes (Opp. at 4-5), the Court of Appeals at one point also accepted the broader "investment definition" set forth in Matter of Waldstein (160 Misc 763, 767 [Sup Ct, Albany County, 1936]) as another way to determine whether an offering or transaction is a security (see All Seasons, 68 NY2d at 94). Under Waldstein, "any form of instrument used for the purpose of financing and promoting enterprises, and which is designed for investment, is a security according to the modern meaning of that term" (Waldstein, 160 Misc at 767). It is ultimately unclear whether the Waldstein approach is still accepted in this state after the First Meridian decision, although at least two courts (including the Third Department) continue to cite Waldstein (in addition to Howey) as one of the "securities law test[s] recognized in New York" (see People v Van Zandt, 43 Misc 3d 563, 573 [Sup Ct, Bronx County, 2014]; Xerox Corp. v New York State Tax Appeals Tribunal, 110 AD3d 1262, 1267 [3d Dept 2013])). Assuming, without deciding, that the Waldstein test is an accepted approach, the EIAs satisfy this test because the EIAs allowed Celsius to finance the collateralized loans it offered as part of its profit-generating efforts.

Footnote 8:As a result, the analysis in First Citizens Fed. Sav. & Loan Ass'n v Worthen Bank & Tr. Co., cited by Mashinsky has no persuasive value to this court given its markedly different factual scenario (see 919 F2d 510 [9th Cir 1990] [explaining that plaintiff was nothing more than a "secured lender" that received a fixed interest rate that was "not dependent on the managerial or entrepreneurial skills" of defendant]).

Footnote 9:For these same reasons, Mashinsky's reliance on cases such as Banco Espanol de Credito v Sec. Pac. Nat. Bank., Resolution Tr. Corp. v Stone, and Am. Fletcher Mortg. Co., Inc. v U.S. Steel Credit Corp.—all of which preceded Edwards—is entirely misplaced (Banco Espanol, 763 F Supp 36, 44 [SD NY 1991] ["plaintiffs had no expectation of capital appreciation from the monies placed in the loans; the rate of return consisted solely of the repayment of the principal plus a fixed rate of interest"]; Resolution Tr. Corp., 998 F2d 1534, 1540 [10th Cir 1993] [declining to recognize that enhanced automobile receivables were securities because, in part, plaintiff only alleged that it received fixed interest payments]; Am. Fletcher Mortg., 635 F2d 1247, 1254 [7th Cir 1980] [concluding that loan was not a security, in part, because it was "not premised upon a reasonable expectation of profits" given that it bore interest at a "fixed rate above prime"). Not only did each of these cases seemingly reason that "fixed" returns necessarily preclude a finding that an investment involved a reasonable expectation of profit, but, in any event, each case also involved entirely distinguishable factual situations from the case at hand.

Footnote 10:Specifically, in Troice, the U.S. Supreme Court concluded that "[a] fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security'" when determining whether a private right of action is precluded by the Securities Litigation Uniform Standards Act, 15 U.S.C. § 78bb(f)(1)(A) (see 571 US at 387).

Footnote 11:Mashinsky also contends that NYAG's allegations concerning Celsius's investment with Alameda is fraud by hindsight. Although a closer call, the court is inclined to permit NYAG's allegations concerning Celsius's loans to Alameda to proceed. To be sure, the nexus between Mashinsky's knowledge of the riskiness of investing with Alameda and Alameda's eventual bankruptcy is, at best, tenuous (see AC ¶¶ 71-73). However, these allegations, when coupled with other allegations concerning Celsius's deployment strategies, tends to support the fraudulent nature of Mashinsky's representations (see id. ¶¶ 45, 47, 54, 58, 61, 70-72, 74).

Footnote 12:Cohen v Brown, Harris, Stevens, Inc. is not to the contrary (64 NY2d 728 [1984]). In Brown, plaintiffs advanced a fraud cause of action that was premised, in part, on defendants alleged failure to comply with the Martin Act's disclosure provisions (id. at 731). The Court of Appeals concluded that this claim was properly dismissed because plaintiffs were unable to establish how they suffered any injury because of defendants' failure to comply with the disclosure provisions (id.). This case does not, as Mashinsky claims, establish that a Martin Act fraud claim brought by NYAG, which otherwise does not require allegations of scienter or reliance, must be dismissed for failure to specify an amount of damages.

Footnote 13:Mashinsky's contention that NYAG's pursuit of "restitution of all amounts or assets obtained from investors" inherently makes Celsius a necessary party (see MOL at 22-23) ignores the fact that NYAG's remedy of restitution is targeted at solely Mashinsky.

Footnote 14:Although the First Department in New Delhi Tel. Ltd v Nielsen Holdings N.V. did conclude that an entity was a necessary party because its conduct was "at issue in every cause action," a key determination was that plaintiff alleged that the nonparty was "defendants' joint venture," and it was this joint venture that engaged in the fraudulent conduct at issue in plaintiff's complaint (111 AD3d 437, 437 [1st Dept 2013]). Here, by contrast, NYAG's allegations are focused on Mashinsky's misconduct. While NYAG alleges Mashinsky was acting to promote Celsius, it is ultimately his alleged misrepresentations and omissions that are at issue in this dispute.